Jewel VINCENT, Claimant-Appellant,

v.

HUGHES AIR WEST, INC., a corpora-
tion, United States of America,
Defendant-Appellee.

Howard BRAND et al.,
Plaintiffs-Appellants,

v.

HUGHES AIR WEST, INC., a corpora-
tion, Defendant-Appellee.

Norene E. FORGY et al.,
Plaintiffs-Appellants,

v.

HUGHES AIR WEST, INC., a corpora-
tion, Defendant-Appellee.

Cynthia KALBFLEISCH et al.,
Plaintiffs-Appellants,

v.

HUGHES AIR CORP., a corporation,
d/b/a Air West, Inc., etc., et al., United
States of America, Defendants-Appellees.

Daniel SUBIC and Alice Elder,
Plaintiffs-Appellants,

v.

HUGHES AIR WEST, INC., a corpora-
tion, and United States of America,
Defendants-Appellees.

Norene E. FORGY et al.,
Plaintiffs-Appellants,

v.

The UNITED STATES of America et al.,
Defendants-Appellees.

Howard BRAND et al.,
Plaintiffs-Appellants,

v.

The UNITED STATES of America et al.,
Defendants-Appellees.

James A. THOMAS, Plaintiff-Appellant,

v.

HUGHES AIR CORPORATION, etc., et
al., Defendants-Appellees.

James A. THOMAS, Plaintiff-Appellant,

v.

UNITED STATES of America,
Defendant-Appellee.

Kathryn J. THOMAS et al.,
Plaintiffs-Appellants,

v.

UNITED STATES of America,
Defendant-Appellee.

James A. THOMAS, Plaintiff-Appellant,

v.

HUGHES AIR CORPORATION, etc.,
Defendant-Appellee.

Kathryn J. THOMAS et al.,
Plaintiffs-Appellants,

v.

HUGHES AIR CORPORATION, etc.,
Defendant-Appellee.

Apolinar ESPITIA et al.,
Plaintiffs-Appellants,

v.

HUGHES AIR WEST, INC., etc., et al.,
Defendants-Appellees.

Cheryl Johnson DEVEAU et al.,
Plaintiffs-Appellants,

v.

HUGHES AIR WEST, INC., etc., et al.,
Defendants-Appellees.

Guillermo RANGEL et al.,
Plaintiffs-Appellants,

v.

HUGHES AIR WEST, INC., a corpora-
tion, Defendant-Appellee.

Ana Rosa RANGEL et al.,
Plaintiffs-Appellants,

v.

HUGHES AIR WEST, INC., a corporation, Defendant-Appellee.

Daniel SUBIC and Alice Elder,
Plaintiffs-Appellants,

v.

UNITED STATES of America,
Defendant-Appellee.

Cheryl Johnson DEVEAU et al.,
Plaintiffs-Appellants,

v.

UNITED STATES of America,
Defendant-Appellee.

Apolinar ESPITIA et al.,
Plaintiffs-Appellants,

v.

UNITED STATES of America,
Defendant-Appellee.

Guillermo RANGEL et al.,
Plaintiffs-Appellants,

v.

UNITED STATES of America,
Defendant-Appellee.

Ana Rosa RANGEL et al.,
Plaintiffs-Appellants,

v.

UNITED STATES of America,
Defendant-Appellee.

Steven BIRD, Plaintiff-Appellant,

v.

HUGHES AIR WEST, INC., et al.,
Defendants-Appellees.

Leland A. HARWARD and Phyllis
Harward, Plaintiffs-Appellants,

v.

UNITED STATES of America et al.,
Defendants-Appellees.

Margaret M. REEVES et al.,
Plaintiffs-Appellants,

v.

The UNITED STATES of America,
Defendant-Appellee.

Steven BIRD, Plaintiff-Appellant,

v.

UNITED STATES of America,
Defendant-Appellee.

HARTFORD ACCIDENT AND INDEM-
NITY COMPANY, Plaintiff-Appellant,

v.

UNITED STATES of America,
Defendant-Appellee.

Nos. 74–3283, 75–1630, 75–1660, 75–1629, 75–1639, 75–1661, 75–1631, 75–1658, 75–1659, 75–1656, 75–1658, 75–1657, 75–1633, 75–1641, 75–1637, 75–1638, 75–1640, 75–1642, 75–1634 to 75–1636, 75–1653, 75–1654, 75–1599, 75–1655, and 75–1632.

United States Court of Appeals,
Ninth Circuit.

June 16, 1977.

Ned Good, Los Angeles, Cal., Floyd A. Demanes, Burlingame, Cal., Myron D. Gabbert, Jr., Moffatt, Thomas, Barrett & Blanton, Boise, Idaho, Charles D. Sneathern, Daniel C. Cathcart, Los Angeles, Cal., argued on behalf of all appellants.

Ben Margolis, Margolis, McTernan, Scope & Sacks, Los Angeles, Cal., John D. Miller, Miller, Bronn & Brummett, Long Beach, Cal., argued on behalf of appellees.

Before CARTER and WALLACE, Circuit Judges, and KING,* District Judge.

WALLACE, Circuit Judge:

In consolidated cases arising out of a 1971 air crash disaster, the district court awarded attorneys' fees to four law firms that had comprised a plaintiffs' "committee of lead counsel" for discovery and other purposes. The award was to be paid out of the various settlements negotiated between the defendants, Hughes Air West, Inc. (Hughes) and the United States, and the next-of-kin of the crash victims. Some of the next-of-kin and their attorneys appeal, contending either that the district court had no authority to make the award or that the court erred in computing the award and designating the recipients. We affirm all the district court's orders except those which apply to Jewel Vincent and the individuals represented by attorney Demanes; as to those we reverse.

I

On June 6, 1971, a Marine Corps jet fighter and a Hughes Air West DC-9 collided in mid-air over Duarte, California. All 49 occupants of the commercial airliner were killed, as was the pilot of the military jet. The radar man, or navigator, of the military jet parachuted to safety. Ten days later the family of Keith A. Gabel, one of the Air West passengers, filed a petition in the Central District of California to perpetuate testimony. In this petition, which contained some "class" allegations, the Gabel family (Gabel) was represented by the law firm of Miller, Bronn, Brummett & Porter (Miller firm).

On the same day that the Gabel family filed its petition, and in the following weeks, the next-of-kin of various crash victims commenced actions against Hughes and other defendants.[1] These actions, eventually to total more than 60, were brought in state and federal courts in Washington, Utah and California. More than 30 of these actions were filed in the Central District of California, all of which were assigned to the same district judge.

On June 18, 1971, the district judge ordered Hughes to file in camera a sealed list containing the names and addresses of all crash victims and their survivors. On July 8 Hughes complied and on July 30 the district court sent notice to next-of-kin advising them, among other things, that various actions involving the air crash had already been commenced in that court, that all actions arising out of the crash might involve common questions of law and fact on the issue of liability, that "common discovery proceedings" would be beneficial, and that the recipient of the notice should contact counsel. Also in July, the court granted the Gabel petition to perpetuate testimony. Thereafter, the Miller firm and different law firms representing various other plain-

---

* Honorable Samuel P. King, United States District Judge, District of Hawaii, sitting by designation.

1. Under the Federal Tort Claims Act, suits against the United States could not be filed until six months after claims seeking administrative relief were lodged. 28 U.S.C. § 2675.

tiffs commenced discovery against both Hughes and the United States.

In January 1972, the Miller firm filed a complaint on behalf of Gabel against the United States. This complaint, in addition to the individual claims, contained class allegations and sought on behalf of the entire class a declaratory judgment on the issue of liability. The complaint was accompanied by a request that this newly-commenced action be consolidated with an earlier Gabel action against Hughes and the initial petition to perpetuate testimony. After the district court granted the consolidation request, Gabel moved for an order certifying the class. Both the United States and various plaintiffs—including the plaintiffs represented on this appeal by Magana & Cathcart (Cathcart), Oliver, Sloan, Shaffer & Lindvig (Oliver), Ned Good and Floyd Demanes—opposed the motion.

The district court did not act on this motion immediately. It did, however, in April 1972, send notice to all survivors on the *in camera* list that Hughes and the United States had reached an agreement regarding their respective contribution to any eventual settlement or adverse judgment.

In July 1972, the Judicial Panel on Multidistrict Litigation, pursuant to 28 U.S.C. § 1407, transferred to the Central District of California 11 cases arising out of the crash and then pending in other districts. Nine came from the District of Utah; two from the Western District of Washington. *In re Air Crash Disaster at Duarte, California,* 346 F.Supp. 529 (Jud.Pan.Mult.Lit. 1972); *see also In re Duarte, California Air Crash Disaster,* 354 F.Supp. 278 (Jud.Pan. Mult.Lit. 1973). Soon thereafter, the district judge ordered all of the air crash cases consolidated for the sole purpose of determining liability. On the same day, August 30,[2] he appointed John D. Miller of the Miller firm "liaison counsel between plaintiffs' counsel" and directed Miller to call a meeting of plaintiffs' counsel

for the purpose of agreeing upon lead counsel or a committee of lead counsel, with Mr. Miller as Chairman, for all plaintiffs, to conduct all further discovery on liability and to try the case on liability, if that becomes necessary, and to voluntarily agree upon the contribution by non-members of such committee to a fund to be deposited with the Clerk from moneys paid by defendants resulting from the above-numbered lawsuits, to reimburse said committee members for such additional work as may result from the activities of said committee, and for compensation of fees to the members of said committee for work performed for the benefit of all plaintiffs. The members of the committee will keep accurate account of their time and expenditures as members of and for said committee.

At the ordered meeting of plaintiffs' counsel, a majority of those present selected four law firms to serve as a committee of lead counsel: the Miller firm; Ray, Quinney & Nebeker of Salt Lake City; Margolis, McTernan, Scope & Sacks of Los Angeles; and Prince, Yeates, Ward, Miller & Geldzahler of Salt Lake City. (These firms are the real appellees as they have the total stake in the present appeal.) A majority of those present also agreed to let the district court determine the method and amount of payment to lead counsel for their work. Some objected to this plan.

The proceedings of this meeting were presented to the district judge and on December 11, 1972, he confirmed the appointment of the committee of lead counsel. In support of his action, the judge noted that "there has been some unnecessary duplication of effort among plaintiffs' counsel" regarding pretrial motions and discovery and pointed to his authority under Rule 43, Fed.R.Civ.P., to "make such orders . . . as may tend to avoid unnecessary costs and delay." The court then outlined both the responsibilities of lead counsel—"to conduct all further pre-trial proceedings, to bring or

---

2. All dates referring to materials in the Clerk's Record are taken from the clerk's file stamp.

oppose all motions, and to prepare and conduct the trial on the issue of liability"—and the concurrent restrictions on plaintiffs' counsel not so designated (nonlead counsel), constituting generally a prohibition against initiating either further discovery proceedings or pretrial motions without first securing approval of lead counsel. The court did not grant lead counsel an absolute veto, however. Nonlead counsel disappointed with a decision of lead counsel could "apply to the Court for an order authorizing him to file [his proposed] motion or initiate [his proposed] discovery proceeding." Regarding attorney fees, the court stated:

> Reasonable compensation for the services of the committee members and reimbursement of their costs shall be provided in such amounts as shall be fixed by the Court and shall be payable by the class members in such proportions as the Court shall determine after appropriate hearing on notice.

In this order, the court referred to "class members" because it had, two months prior to that date, granted Gabel's motion and certified the consolidated Gabel actions as a class action. *Petition of Gabel,* 350 F.Supp. 624 (C.D.Cal.1972). Although Gabel had moved for certification under all three subsections of Rule 23(b), Fed.R.Civ.P., the court certified the class under only the first two, Rule 23(b)(1) and (2). Accordingly, class members were extended no opportunity to opt-out, and the vigorous efforts of many plaintiffs, some of whom are present here as appellants, to exclude themselves from the class were denied.

On March 2, 1973, the Miller firm moved for an order requiring class members to deposit five percent of any judgment or settlement with the clerk of the court and prohibiting Hughes and the United States from settling any class member's claim without prior court approval. The motion also requested that Hughes and the United States be required to disclose all prior settlements with class members and to deposit with the clerk an amount equal to five percent of those settlements. In addition, the motion sought clarification from the court on the amount and source of attorneys' fees for lead counsel. The United States opposed the motion, as did many nonlead attorneys. Indeed, even a member of the committee of lead counsel, the firm of Ray, Quinney & Nebeker, opposed the motion, arguing that the five percent requirement should not extend to settlements involving class members represented by lead counsel.

After a hearing, the district judge entered an order granting substantial portions of the Miller firm's motion. Only that portion of the motion dealing with settlements already completely concluded was not incorporated in the court's order. To clarify the source of the five percent payment, the court directed that it come from the contingent fee of the claimant's attorney to the extent that that fee exceeded 20 percent of the total recovery. The balance, if any, was to be paid from the claimant's portion of the recovery.

On March 19, 1973, the district judge, sua sponte, ordered "that all of the cases not originating in this District [but transferred here] . . . are transferred to the Central District of California on all issues for all purposes." *In re Aircrash Near Duarte, California,* 357 F.Supp. 1013, 1016 (C.D.Cal. 1973). Soon thereafter, on April 5, 1973, Hughes and the United States agreed not to contest the issue of liability, and the court immediately sent notice of this agreement to all survivors appearing on the *in camera* list. Settlement efforts then proceeded and by the end of the year most of the claimants had agreed on a settlement figure with the defendants.

As settlements were finalized and approved by the court and five percent of the recoveries deposited, the amount in the depository, generally referred to as the Special Class Fund, grew to over $450,000. In December 1973, the district court gave notice of a hearing to consider disbursement of the fund. The Miller firm and others commenced filing affidavits and other materials as proof of the time and costs they

had expended on the liability issue. Some of the firms also filed pleadings and affidavits opposing the claims of various attorneys.

During four days in April 1974, the court conducted a hearing on the disbursement issue. The committee of lead counsel called two experts, as did the court. The court-appointed experts were attorneys, not involved in any of the Duarte air crash cases, with extensive experience in aviation litigation. On the basis of their testimony and the entire record of the consolidated actions, the district judge, in final orders issued in August 1974, found that the work of lead counsel was competent and benefitted all claimants by removing the liability issue, that any services of nonlead counsel were not "for and on behalf of the entire Class," and that the value of lead counsel's services was between five and ten percent of the gross recoveries. Accordingly, the district judge awarded the entire Special Class Fund, minus the costs incurred by individual attorneys on the liability issue, to the committee of lead counsel. He further directed members of that committee to reach an agreement among themselves regarding division of the fund or, in the event of a failure to do so, to submit the matter to arbitration.

Most attorneys not on the committee and their clients acquiesced in the orders. Five groups of claimants and attorneys, however, have appealed: Jewel Vincent, who "appeared" in the district court pro se but who is represented on this appeal, the claimants represented by Mr. Demanes, those represented by Mr. Good, and those represented by the Oliver and Cathcart firms in a jointly-prosecuted appeal. We have consolidated these appeals on our own motion.

## II

The position of Jewel Vincent in these consolidated appeals is unique. Soon after receiving word of her husband's death in the air crash, she determined, first, that because liability was (to her) clear, she had no need to and would not file a lawsuit against any person in any court but rather would use nonjudicial means to secure recovery, and, second, that no outsider would "profit" from her husband's death. Accordingly, she directed the law firm that previously had assisted her and her husband in their business activities to commence negotiations with Hughes and the United States without filing suit. Also at her direction, her attorneys undertook this task on a per hour, rather than on a contingent fee, basis.

In July 1973, three months after the district court entered its order requiring the five percent payment, Hughes and the United States petitioned the court for approval of a settlement previously negotiated with Vincent. This petition "acknowledge[d] the obligation placed by this Court upon members of the Class to deposit 5% of any settlement with the Court  . . . ." In an attached affidavit, Vincent stated that she had agreed with the defendants' attorneys "to allow the deposit of five percent (5%) of said total settlement to be paid, if necessary," into the court. The district court approved this settlement in August and in September, Hughes and the United States deposited five percent of the recovery.

On March 7, 1974, after receiving notice of the proposed proceedings to determine disbursement of the Special Class Fund, Vincent filed a motion, memorandum and affidavit in which she demanded the return of "her" money on deposit, plus interest. Within the month, the Miller firm filed its opposition. Several weeks later, Vincent filed a response.

Given these facts, we believe that *Hartland v. Alaska Airlines*, 544 F.2d 992 (9th Cir. 1976), is dispositive of Vincent's appeal and requires reversal. *Hartland* involved the crash of a commercial airliner near Juneau, Alaska. As in this case, next-of-kin of the victims either filed suits in state or federal court or negotiated for a settlement without invoking judicial processes. The Judicial Panel on Multidistrict Litigation transferred many of the federal cases to the

Northern District of California for pretrial proceedings. One of the claimants, Mrs. Sampson, never filed suit against any of the potential defendants in any court. Another claimant, Mrs. Golub, filed suit against Alaska Airlines in state court and against the United States in federal court. The Judicial Panel on Multidistrict Litigation transferred Golub's federal action to the Northern District of California.[3] Sampson and Golub thereafter successfully negotiated settlement with Alaska Airlines. The airlines, however, deposited five percent of each settlement with the federal district court pursuant to an order almost identical to the order of April 17, 1973, entered in the present case. The purpose of that deposit was to supplement a fund designed to pay the fees of a Plaintiffs' Discovery Committee.

Sampson and Golub appealed, demanding the return of the five percent taken from their settlements. Both because of serious questions regarding the finality of the district court's orders, and hence their appealability under 28 U.S.C. § 1291, and because of a clear usurpation of power by the district court, we treated the appeal as a petition for a writ of mandamus. We then granted the writ because the district court lacked jurisdiction to compel Sampson and Golub to contribute to the fund. Indeed, referring to Sampson, we stated that "the District Court had not even a semblance of jurisdiction—original, ancillary or pendent—to order anything or anybody, and least of all to compel lawyers who were not parties to the action to pay $3,250 into a fund. There was just 'no action' pending anywhere." *Id.* at 1001.

Lead counsel attempt to distinguish *Hartland* on the ground that Mrs. Sampson protested the forced payment more vociferously than did Mrs. Vincent. This is not a relevant distinction. Apparently Mrs. Golub's protest at the time of payment was no more forceful than was Mrs. Vincent's, *see*

*id.* at 999, yet we concluded in *Hartland* that the district court had no jurisdiction to compel Mrs. Golub to pay. Further, it must be remembered that federal courts are courts of limited and congressionally-defined jurisdiction. If parties to a suit cannot confer subject-matter jurisdiction on a federal court by agreement, certainly "nonparties," people who have never been made parties to a suit anywhere, cannot confer such jurisdiction by failing to raise their voices above some unspecified decibel count in protest against the attempted exercise of jurisdiction.

The only plausible basis for valid district court jurisdiction over Vincent or her settlement is the class action. But as is discussed in detail in IV, A *infra*, the class certification order of October 12, 1972, was erroneous. No valid class action including Vincent among its unnamed plaintiffs ever existed. Accordingly, we reverse the order of August 29, 1974, and direct that Vincent's contribution to the Special Class Fund, plus accrued interest, be returned to her.

### III

Our disposition of the appeal brought by Mr. Demanes turns on a question of fact. Demanes contends that his clients concluded their settlement negotiations with Hughes and the United States in July 1972. Lead counsel were not designated until the end of August 1972 and the class was not certified until October 1972. Accordingly, Demanes contends, the district court had no basis for requiring him to contribute to the Special Class Fund; lead counsel could not possibly have conferred any benefit on his clients through their discovery efforts undertaken after their appointment. Lead counsel dispute the July settlement date and point to certain activities of Demanes as late as December 1972 that are inconsistent with a finding of a July settlement.

---

**3.** There was also a third action involving Mrs. Golub, but because she was never served with a summons and never appeared in that action, it was not relevant or material to our disposition of the appeal. *See* 544 F.2d at 998.

The evidence in the record establishes that Demanes' clients settled in July 1972. Most crucial is a pleading filed by Hughes and the United States on April 15, 1974, entitled "Compliance with Court Order of April 9, 1974" in which Hughes and the United States produced "copies of all letter offers to settle cases and copies of all letters confirming settlements in cases arising out of the mid-air collision at Duarte, California  .  .  .." One of those letters, from the United States to Demanes, confirms their settlement agreement; it is dated July 11, 1972. Almost as convincing is an affidavit filed by the Miller firm in March 1973 in support of that firm's motion for an order compelling the deposit of five percent of all judgments or settlements. John D. Miller swore that he attended an *ex parte* hearing in August 1972 before the district judge to secure court approval of the settlement negotiated between the defendants and Demanes' clients. There are, in addition, other references to a July 1972 settlement scattered throughout the twenty-one volume record in this case.

Accordingly, we hold that any explicit or implicit finding of fact by the district court that Demanes' clients settled *after* appointment of lead counsel to be clearly erroneous. Rule 52(a), Fed.R.Civ.P. This holding in turn leads to the conclusion that the post-appointment efforts of lead counsel could not have been a cause-in-fact of the settlement negotiated between the defendants and Demanes' clients. *See* note 10 *infra*. The court's conclusion of law concerning Demanes' obligation to pay into the Special Class Fund must therefore fall. As to this issue, the final order is reversed. Demanes is entitled to a return of his deposit, plus interest.

## IV

The remaining appellants (hereafter referred to jointly as "nonlead counsel" because all of the money at issue here came from the attorneys' portion of the settlements) can be treated as one for the purposes of this appeal; their cases cannot be distinguished on the basis of any material fact. To respond to the arguments of nonlead counsel, we turn first to one of the two asserted bases for the district court's orders in the present case: the federal courts' historic equity powers in class actions.

## A

■ The propriety of a Rule 23 class action covering a mass accident, such as the crash of a commercial airliner, has generated considerable scholarly debate, *e.g.*, 3B J. Moore, Federal Practice ¶ 23.45[3], at p. 23–811 n. 35; 7A Wright & Miller, Federal Practice & Procedure § 1783; Note, *Mass Accident Class Actions*, 60 Cal.L.Rev. 1615 (1972); Annot., 28 A.L.R.Fed. 719 (1976), and to a more limited extent analysis by the federal courts, *e.g.*, *McDonnell Douglas Corp. v. United States District Court*, 523 F.2d 1083 (9th Cir. 1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976); *Causey v. Pan American World Airways, Inc.*, 66 F.R.D. 392 (E.D.Va.1975); *Petition of Gabel, supra*, 350 F.Supp. 624. It is now settled in this circuit, however, that a class action brought on behalf of the next-of-kin of aircrash victims and certified under Rule 23(b)(1) or (2) is not proper. *McDonnell Douglas Corp. v. United States District Court, supra*, 523 F.2d 1083. At the same time, the propriety of such a class action under Rule 23(b)(3) remains an open question.

In the present case, the Miller firm moved for an order certifying the class under any or all of the three subdivisions of Rule 23(b). In its certification order, however, the district court certified the class under only the first two, Rule 23(b)(1)(A) and ᐧ(B) and 23(b)(2). *Petition of Gabel, supra*, 350 F.Supp. at 630. The court's actions thereafter were also inconsistent with the view that the class was being maintained under Rule 23(b)(3). Various plaintiffs attempted to exclude themselves from the class, a right members of a Rule 23(b)(3) class clearly have. Rule 23(c)(2), Fed.R.

Civ.P.[4]  The district court rejected all these efforts.  Further, the court, although it did send notice to all persons on the *in camera* list advising them of important developments in the action, never directed that notice complying with Rule 23(c)(2) be sent.  Such notice is essential to the maintenance of a class action under Rule 23(b)(3).

Because the class was certified only under 23(b)(1) and 23(b)(2), we must conclude, on authority of *McDonnell Douglas Corp. v. United States District Court, supra,* 523 F.2d 1083, that no valid class action ever existed and that the district court's equitable authority over attorneys and attorneys' fees under Rule 23[5] cannot serve in the present case, where nonlead counsel objected to the class, to sustain the court's orders.  We turn, therefore, to a related theory upon which lead counsel primarily rely: the "common benefit" doctrine.

### B

■  In its traditional form, and as originally developed, the common benefit rule was limited to the reimbursement or award of attorneys' fees from an identifiable fund under the court's control and was referred to as the "common fund" doctrine.  More recently, within approximately the last 20 years, a significant variation on the common fund approach has appeared, generally referred to as the "substantial benefit" doctrine.[6]  *See generally* Dawson, *Lawyers and Involuntary Clients: Attorney Fees from Funds,* 87 Harv.L.Rev. 1597 (1974) (hereafter cited as I Dawson); Dawson, *Lawyers and Involuntary Clients in Public Interest Litigation,* 88 Harv.L.Rev. 849 (1975) (hereafter cited as II Dawson); Note, *Reimbursement for Attorneys' Fees from the Beneficiaries of Representative Litigation,* 58 Minn.L.Rev. 933 (1974).  To support their position, lead counsel have selected and argued isolated aspects of both the common fund and substantial benefit doctrines.  We believe that because any benefits derived by the clients of nonlead counsel are pecuniary, the substantial benefit doctrine has no place in this case[7] and that the position of

---

**4.** Whether members of a Rule 23(b)(1) or (2) class may exclude themselves from the class remains an open question in this circuit.  *See Bauman v. United States District Court,* 557 F.2d 650 (9th Cir. 1977).  Most courts in other jurisdictions have concluded that they may not.  *See id.* at 659.

**5.**  *See generally* 7A Wright & Miller, Federal Practice and Procedure § 1803; Dawson, *Lawyers and Involuntary Clients in Public Interest Litigation,* 88 Harv.L.Rev. 849, 915–29 (1975); Annot., 38 A.L.R.3d 1384 (1971).

**6.**  The variation is sufficiently extensive that some commentators have categorized the substantial benefit doctrine as a separate exception to the general rule that the prevailing party is not entitled to collect a reasonable attorney's fee from the loser.  *E.g.,* Case Note, 1975 B.Y.U.L.Rev. 777, 780–81; *cf.* Note, *Attorney Fees: Exceptions to the American Rule,* 25 Drake L.Rev. 717, 729–33 (1976).

**7.**  The substantial benefit doctrine can be explained by reference to the two Supreme Court cases applying it.  *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), and *Hall v. Cole,* 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973).

In *Mills,* stockholders brought a derivative action on behalf of all minority shareholders to set aside a merger involving their company because the proxy solicitations for the merger were materially misleading and violated section 14(a) of the Securities Exchange Act of 1934.  In granting an interim award of attorneys' fees, the Court stated that an ultimate monetary recovery (i.e., a traditional "fund") was not necessary if the litigation conferred a "substantial benefit on the members of an ascertainable class" and "the court's jurisdiction over the corporation as nominal defendant made it possible to assess fees against all the shareholders through an award against the corporation."  396 U.S. at 392, 393–95, 90 S.Ct. at 627.  The benefit conferred in this case was, in the Court's view, the vindication of the congressionally-stressed value "of fair and informed corporate suffrage."  *Id.* at 396, 90 S.Ct. at 627.  To the Court, "private stockholders' actions of this sort 'involve corporate therapeutics . . . .' "  *Id.*

In *Hall,* a union member expelled by his union for criticizing its actions and policies brought suit under the Labor-Management Reporting and Disclosure Act of 1959, which guarantees union members a right of free speech.  The Court ordered his reinstatement and then, on the authority of *Mills,* awarded him attorneys' fees.  It found the requisite substantial, nonmonetary benefit in the fact that the union member not only vindicated his own right of free speech but "necessarily rendered a substantial service to his union as an institu-

lead counsel must stand or fall on the traditional common fund doctrine.

■ The common fund doctrine provides that a private plaintiff, or his attorney, whose efforts create, discover, increase or preserve a fund to which others also have a claim is entitled to recover from the fund the costs of his litigation, including attorneys' fees. The doctrine is "employed to realize the broadly defined purpose of recapturing unjust enrichment." I Dawson 1597. That is, the doctrine is designed to spread litigation costs proportionately among all the beneficiaries so that the active beneficiary does not bear the entire burden alone and the "stranger" beneficiaries do not receive their benefits at no cost to themselves.

The doctrine is exemplified by the fountainhead case, *Trustees v. Greenough*, 105 U.S. 527, 26 L.Ed. 1157 (1881). Vose held bonds of the Florida Railroad Company. A fund, consisting of ten or eleven million acres of state-owned land, had been pledged for the payment of the interest accruing on the bonds and installments of the sinking fund for meeting the principal. The fund's trustees, however, through various fraudulent conveyances, wasted a portion of the fund and failed to pay the interest on the bonds or the sinking fund installments. Vose, "with great vigor and at much expense," *id.* at 529, pursued litigation that secured and saved a large amount of the fund. Other bondholders thereupon "came in and took the benefit of the litigation," *id.* When Vose sought reimbursement for his expenditure of attorneys' fees, the Supreme Court permitted it. In the Court's view, the most equitable way to reimburse Vose for his expenses was by making them a charge upon the fund, which at that time was still being administered by a receiver under the trial court's direction. *Id.* 105 U.S. at 532.

A significant expansion of *Greenough*, relevant to this case, occurred four years later in *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885). Attorney Pettus' client successfully brought a creditors' bill to reach the assets of a debtor-railroad, and the client paid Pettus[8] the amount set in their contract. Pettus thereupon attempted to recover for the services he had "provided" to creditors named as class members in the creditors' bill. The Supreme Court allowed the *extra* fee and even gave Pettus a lien on the railroad's assets that had been preserved by the original decree and made

---

tion and to all of its members." 412 U.S. at 8, 93 S.Ct. at 1948. In the Court's view,

> by vindicating his own right, the successful litigant dispels the "chill" cast upon the rights of others. Indeed, to the extent that such lawsuits contribute to the preservation of union democracy, they frequently prove beneficial "not only in the immediate impact of the results achieved but in their implications for the future conduct of the union's affairs." . . . Thus, as in *Mills*, reimbursement of respondent's attorneys' fees out of the union treasury simply shifts the costs of litigation to "the class that has benefited from them and that would have had to pay them had it brought the suit."

*Id.* at 8–9, 93 S.Ct. at 1948 (citations and footnotes omitted).

It is clear from this summary of *Mills* and *Hall* that the substantial benefit doctrine was devised to permit fee shifting in cases not covered by the common fund doctrine because of the absence of a pecuniary benefit but yet involving interests of broad public importance, interests that Congress sought to vindicate at least in part through private litigation. Indeed, in *Mills* "the essential ground of decision clearly was a reading of congressional intent." Dawson, *supra* note 5, 88 Harv.L.Rev. at 868.

In the present case, the only conceivable benefit conferred by lead counsel was pecuniary: aid in establishing liability which in turn opened the door to a judgment or settlement for money damages. When the benefit is pecuniary, we believe the case should be measured against the traditional criteria of the common fund doctrine. We are reinforced in this view by the uncertainty regarding the continued authority of *Mills* and *Hall*—in any area other than corporate and union "therapeutics"—created by the Supreme Court's more recent decision in *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).

**8.** Other attorneys were involved. For simplicity's sake, reference is made only to Pettus.

available to satisfy the creditors' claims. As Professor Dawson has noted:

> The *Pettus* case totally transformed [the claim of a *client* for contribution to the litigation costs that he had incurred, as recognized in *Greenough*,] into an independent right of the *lawyer*, reinforced by lien, to an extra reward so that he might share the wealth of strangers. The lawyer was suddenly thought of as producer of this wealth, though he did nothing more than perform his contract with his own client, and furthermore had been paid by his client in full the sum he had agreed to accept.

I Dawson 1603–04 (emphasis in original).

■ Certain elements of the common fund doctrine, either as developed in these two cases or as fashioned in the many cases applying the doctrine since, are relevant to the present case. First, the original client's attorney's fees are not shifted to— or the attorney's personal claim for an extra fee is not lodged against—the adversary-losing party; rather, fees are shifted to third parties, people viewed as beneficiaries of the fund in some way. Second, no contractual relationship exists between the original attorney and the third parties. Rather, the common fund doctrine is rooted in concepts of quasi-contract and restitution. Third, the beneficiaries are expected to pay litigation costs in proportion to the benefits that the litigation produced for them. *See id.* at 1633. Fourth, as a general rule, if the third parties hire their own attorneys and appear in the litigation, the original claimant cannot shift to them his attorney's fees. *See id.* at 1647–51. Some cases stand as an exception to this element, however. *E. g.*, *Doherty v. Bress,* 104 U.S.App.D.C. 308, 262 F.2d 20 (1958), *cert. denied,* 359 U.S. 934, 79 S.Ct. 649, 3 L.Ed.2d 636 (1959). Fifth, the third parties are not personally liable for the litigation costs. Any claim must be satisfied out of the fund. Note, *supra,* 58

Minn.L.Rev. at 944. A concomitant element of the doctrine, indeed one of its foundation stones, is that there must exist some identifiable assets on which a court can impose a charge. *See* I Dawson 1618. Nevertheless, the concept of "fund" is flexible, and it is now settled that a money judgment or even a settlement can serve as a fund. *Id.* at 1620; *Doherty v. Bress, supra,* 262 F.2d 20. What is crucial is that the court can legitimately exercise authority or control over the asset. I Dawson 1618.

■ Some of these elements are clearly satisfied in this case. For example, the extra fee awarded to lead counsel came from beneficiaries of the litigation (or, more accurately in most cases, from their attorneys) in proportion to the benefits that the litigation produced for them.[9] No fee was awarded against Hughes or the United States. Further, although the participation of most counsel in the "selection" of lead counsel has somewhat the flavor of a consensual agreement, it is clear that the district court, in granting the award, proceeded on concepts of quasi-contract and restitution and not on any theory of contract enforcement. Finally, lead counsel were given a charge on the Special Class Fund, not a personal judgment against any claimant or nonlead counsel.

Finding the remaining elements of the doctrine in this case is more difficult, however. For example, at first blush it appears that there is no true fund present that has been created, increased or protected by lead counsel. It can be argued that the Special Class Fund does not qualify because it was deliberately manufactured by court order, albeit at the request of lead counsel, for the sole purpose of providing a fund out of which lead counsel could be reimbursed. This process, the argument goes, is bootstrapping of the rankest order in that an attorney and the court create by compulsion

---

9. In his findings of fact, the district judge stated that "the reasonable value of the legal services of Class Counsel of Benefit to all Class Members on the issue of liability is not less than 5% of the total recoveries of Class Members." The clear implication of this statement is that the efforts of lead counsel had benefitted each member of the class at least to the extent of five percent of the amount recovered by the class member.

a fund which in turn they use to trigger application of the common fund doctrine. Yet the Special Class Fund is not the only asset in this case which can be used to satisfy the requirements of the common fund doctrine. Taking a broader view, we see that lead counsel helped "create" a fund consisting of the various settlements negotiated in these consolidated actions. The court found as a matter of fact that the efforts of lead counsel were instrumental in persuading Hughes and the United States not to contest liability and accordingly were a significant cause-in-fact of the settlements.[10]

Turning to the related requirement that the fund be within the court's control, it is clear that the district court exercised a form of control over the settlements in that none could be finalized without its approval.[11] That approval always required a deposit into the Special Class Fund and hence a continuing court-exercised control over five percent of the settlements. Clearly the court's relinquishment of control over the remaining 95 percent of the fund is irrelevant here because the attorneys' fees did not exceed the retained portion. Accordingly, we hold that both the "fund" and "court control" elements of the common fund doctrine are satisfied by the facts of this case.

The general rule that third parties can "purchase immunity"[12] by hiring their own attorneys and participating in the litigation poses greater problems. The operation of this rule is demonstrated by the "exceptionally complex"[13] Plumbing Fixture Antitrust Cases. *Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.*, 322 F.Supp. 834 (E.D.Pa.), *modified sub nom., Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30 (3d Cir. 1971); *Philadelphia Housing Authority v. American Radiator & Standard Sanitary Corp.*, 323 F.Supp. 364 (E.D.Pa.1970). The relevant parts of those cases have been accurately summarized as follows:

> [S]ome 370 actions were consolidated pursuant to multidistrict litigation procedures, and the plaintiffs from one of the actions were appointed "Class Representatives." Subsequently a fund was created for the satisfaction of various claims, and at least twelve groups of plaintiffs' attorneys from the several consolidated actions petitioned that fees be awarded from the fund. The petitions of all but the designated representative attorneys were denied. The designated attorneys were awarded fees from the fund in general, but *not* from the portion thereof assigned to the claims of the plaintiffs represented by the other attorneys. In

**10.** Nonlead counsel attack this finding of fact. Certainly it is a crucial finding because the common fund doctrine requires that the work of the attorney seeking an extra fee be a cause-in-fact of any claimed benefit to the fund and its beneficiaries. Note, *Reimbursement for Attorneys' Fees from the Beneficiaries of Representative Litigation*, 58 Minn.L.Rev. 933, 946–54 (1974). Indeed, because this requirement was not satisfied in the case of Mr. Demanes' clients, we reversed the district court's orders applying to them. *See* part III, *supra*. However, our review of the record convinces us that the district court's finding is not clearly erroneous.

**11.** The common fund doctrine requires that the district court's control over the fund be legitimate. We held in part II, *supra*, that because Mrs. Vincent was not a party to any action, the district court had no jurisdiction (i. e., legitimate control) over her or the settlement negotiated by her. The remaining appellants here

have no jurisdictional dispute with the district court and raised neither here nor before the trial court any issue regarding the legitimacy of the district court's "control" over their settlements. We therefore have no need to address this "legitimate control" issue in resolving their appeals. We do note, however, that *Doherty v. Bress*, 104 U.S.App.D.C. 308, 262 F.2d 20 (1958), *cert. denied*, 359 U.S. 934, 79 S.Ct. 649, 3 L.Ed.2d 636 (1959), constitutes authority favorable to the district court's exercise of control over the settlements. *See also* Manual for Complex Litigation § 1.90, at p. 56 (West ed. 1973).

**12.** *See* Dawson, *Lawyers and Involuntary Clients: Attorney Fees from Funds*, 87 Harv.L. Rev. 1597, 1649 (1974).

**13.** Note, *supra* note 10, 58 Minn.L.Rev. at 948 n.110.

other words, the vesting of certain attorneys with a recognized representative status limited reimbursement for the other attorneys to the terms of their individual contracts with their clients. Conversely, the reimbursement of the representative attorneys beyond the terms of their individual contracts was limited to that portion of the fund allocated to beneficiaries which had *not* participated in the suit.

Note, *supra*, 58 Minn.L.Rev. at 947–48 (emphasis added; footnotes omitted).

Nevertheless, the courts have created an exception to this general rule where the contributions of the original or lead attorneys and the attorneys hired by the "stranger" beneficiaries are unequal. *See* I Dawson 1648–51; *but cf. Estate of Korthe*, 9 Cal.App.3d 572, 576–77, 88 Cal.Rptr. 465 (1970). The purpose of this exception is of course identical to the purpose of the broader common fund doctrine itself: avoidance of unjust enrichment, or as it has been referred to in this litigation, "coattailing." The leading decision demonstrating this exception, *Doherty v. Bress, supra*, 262 F.2d 20, is also, of all the cases we have discovered, the case most factually similar to the present case. *Doherty* involved the mid-air collision of two airplanes over National Airport near Washington, D. C. Numerous actions were brought by the next-of-kin of the crash victims (or their subrogees) against the United States and Eastern Airlines. To save the time and expense of multiple trials, many of the plaintiffs and the defendants entered into a stipulation to be bound by the decision in selected test cases, known as the Miller cases, regarding liability and choice of law. Attorney Bress represented the plaintiffs in the Miller cases. Attorney Doherty represented plaintiff-subrogee Hartford Accident & Indemnity Co., a party to the stipulation but not to the Miller cases. Bress successfully litigated the liability issue in the test cases. Doherty thereupon negotiated a $14,500 settlement for his client and the district court awarded him twenty percent of that amount, $2,900, as his fee. Bress then petitioned the district court to set aside this fee allowance and award him an amount equal to the reasonable and fair value of his services that resulted in benefit to Hartford. The district court granted the petition and awarded Bress an extra fee of $1,015, to be paid out of the $2,900 previously awarded to Doherty.

Doherty appealed to the District of Columbia Circuit, arguing that

> Hartford never employed [Bress] as its attorney, that no common fund was created by [Bress'] services, and that Hartford had expressly refused to enter into an agreement, which many other litigants had made with [Bress] under which he acted as chief counsel for numerous parties.

262 F.2d at 22. The court rejected these arguments and affirmed, relying on *Sprague v. Ticonic National Bank*, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939), one of the progeny of *Greenough* and *Pettus*.

We recognize that in this case the disparity in effort between lead counsel and non-lead counsel was effectively compelled by the district court's order of December 11, 1972, confirming lead counsel's appointment and imposing limits on the work of nonlead counsel. Nevertheless, the fact remains that lead counsel, according to the district court's findings, engaged in substantial work after their appointment that benefitted all claimants. On the basis of this finding we believe that the common fund doctrine permits fee shifting of the sort ordered by the district court. We are reinforced in this view by the fact that the district court's deposit formula operated to prevent a "double" payment of attorneys' fees by the claimants. The claimants contributed to the Special Class Fund only to the extent that their contingent fee contracts with their original attorneys called for fees of less than 20 percent. The balance of the five percent deposit came from their attorneys' portions. Accordingly, no claimant paid more than 25 percent of his recovery for attorneys' fees, the limit set by the Federal Tort Claims Act, 28 U.S.C.

§ 2678. Indeed, none of the claimants represented by nonlead counsel before us on this appeal (except Vincent) paid any of their portion of the recovery into the Special Class Fund. All deposits came from their attorneys' shares.

### C

█ As noted above, the disparity in the efforts of lead and nonlead counsel was effectively compelled by provisions in the district court's order confirming the appointment of lead counsel. On this appeal, nonlead counsel make a frontal attack on the power of the district court to promulgate such an order, specifically to appoint lead counsel in multiparty litigation and to restrict the activities of nonlead counsel. We believe that the district court has such power and that the district court properly exercised it in these consolidated cases.

In recent decades, complex multiparty litigation has become an increasingly frequent occurrence in the federal district courts. The causes are many and include, in addition to the substantive laws underlying much of this litigation, the liberal joinder and intervention rules of the Federal Rules of Civil Procedure, Rules 19–20, 24, the provisions of Rule 42(a) permitting consolidation of actions, the provisions of 28 U.S.C. § 1404 permitting transfer by a single district judge, and the significant transfer authority granted to the Judicial Panel on Multidistrict Litigation by 28 U.S.C. § 1407. With this advent of complex multiparty

litigation have come serious administrative problems, and the federal courts have found it necessary to develop innovative procedures to meet the problems. One of the earlier-devised procedures was the appointment of a "liaison counsel." The liaison counsel serves all parties on one side of the dispute. He is selected either by his colleagues or by the court, and his duties are generally ministerial. For example, he may receive and distribute to the parties on his side notices and other documents from the court or adverse parties, or he may call meetings where joint action is considered. The concept of liaison counsel was incorporated in an early edition of the Manual for Complex Litigation. See Manual for Complex and Multidistrict Litigation § 1.9 (1970).

The limited scope of both liaison counsel's authority and his duties, however, sometimes created new problems, especially for plaintiffs in multidistrict aircrash cases. See Beatty, *The Impact of Consolidated Multidistrict Proceedings on Plaintiffs in Mass-Disaster Litigation*, 38 J.Air L. & Comm. 183, 185–91 (1972). Accordingly, proposals were advanced calling for creation of the role of "lead counsel," an attorney or group of attorneys with significant authority and a concomitant responsibility to conduct pretrial discovery and, if necessary, to litigate the liability issue. *See id.* at 189–91. In 1972, the editors of the Manual for Complex Litigation incorporated many of these proposals in section 1.92 of the Manual.[14]

---

14. Section 1.92 reads in part:

In complex and multidistrict litigation involving multiple opposing parties, lead counsel and steering committees have proved to be unusually efficient in pretrial proceedings. Lead counsel are the counsel chosen by the groups of parties having a common interest to brief and argue motions, file opposing briefs in pretrial proceedings initiated by other parties, to prepare proposed written interrogatories, to initiate and conduct proceedings and motions for production and inspection of documents, and to conduct the examination of witnesses in depositions on oral interrogatories, among other things. While the court should not, in the absence of exceptional circumstances, select and appoint lead counsel, the court can request the parties to

select such counsel and encourage the use of lead counsel. Liaison counsel may also act as lead counsel generally or in particular proceedings. In massive litigation where depositions are scheduled simultaneously in several different locations, it will be necessary that there be more than one lead counsel for the groups or parties interested in the depositions. Similarly, it is the court which must make a final determination of any question of whether lead counsel is able to continue as lead counsel. It is also the court which must grant permission to withdraw as lead counsel. See Part I, § 1.44, p. 46, *supra*.

At trial of cases involving a large number of parties represented by different counsel, the court should encourage the opposing parties to select lead counsel to conduct the

Although some courts at an earlier time apparently doubted their power to create the role of lead counsel and oversee its filling, Beatty, *supra*, 38 J.Air L. & Comm. at 191, by the time section 1.92 was added to the Manual for Complex Litigation the authority of the district courts regarding lead counsel was well-established. *MacAlister v. Guterma*, 263 F.2d 65 (2d Cir. 1958), represented "the first time that the power of the courts to order consolidation for the pre-trial stages and the appointment of general [lead] counsel to supervise and coordinate the prosecution of plaintiffs' case [was] presented to a federal appellate court." *Id.* at 67. Defendants in a stockholders' derivative suit moved the district court for an order consolidating various related actions and appointing lead counsel for the consolidated plaintiffs. The district court refused. On appeal, the Second Circuit held that the district court had the "inherent powers" to consolidate and appoint lead counsel but that in that case, the district judge had not abused his discretion in refusing to do so. In support of its decision regarding the district court's authority to appoint lead counsel, the Second Circuit noted:

> The benefits achieved by consolidation and the appointment of general counsel, i. e. elimination of duplication and repetition and in effect the creation of a coordinator of diffuse plaintiffs through whom motions and discovery proceedings will be channeled, will most certainly redound to the benefit of all parties to the litigation.

The advantages of this procedure should not be denied litigants in the federal courts because of misapplied notions concerning interference with a party's right to his own counsel.

*Id.* at 69 (citation omitted).

The authority recognized in *MacAlister* has never been seriously disputed. Indeed, many courts since that decision have explicitly reaffirmed their authority to appoint lead counsel and have exercised that authority. *See, e. g., Katz v. Realty Equities Corp.*, 521 F.2d 1354, 1356 (2d Cir. 1975); *Farber v. Riker-Maxson Corp.*, 442 F.2d 457 (2d Cir. 1971); *Feldman v. Hanley*, 49 F.R.D 48 (S.D.N.Y.1969); *Abrams v. Occidental Petroleum Corp.*, 44 F.R.D. 543 (S.D. N.Y.1968). In *Abrams*, for example, the district court took action similar to that taken by the district judge in this case. The court appointed lead counsel but limited his authority to discovery and other pre-trial proceedings. Nonlead counsel's activities were restricted but they were permitted, in the event of a dispute with lead counsel, to seek special permission from the court to take independent action. The court also indicated that it would fix reasonable compensation for lead counsel after a hearing on the matter.

We likewise hold that the district court had the authority to direct the appointment of a committee of lead counsel.[15] Further, we do not disapprove of the manner in which the district judge exercised that power in this case. The procedures leading to

initial examinations of witnesses, permitting supplemental and non-repetitive questioning by counsel for other parties. And where the parties fail to agree upon a selection, it may be necessary for the court to select and designate the lead counsel who will conduct the initial examination for the opposing parties and groups of parties.

In order to provide leadership for large groups of parties and to coordinate the actions of groups of parties having common interests, the use of steering committees has been beneficial. A steering committee may consist of a number of counsel chosen by the group having a common interest to meet, confer, and to take coordinated action on behalf of the group. The court should encourage the use of steering committees in appropriate cases.

15. It is conceivable that the district court's authority to appoint lead counsel could serve an an independent basis for an order awarding lead or liaison counsel an extra fee for their services. We need not finally decide that question in this case, however. Regarding all the appellants but Vincent and Demanes, the traditional common fund doctrine is available to sustain the district court's orders. Regarding Vincent and Demanes, we are convinced that any attorneys' fees doctrine based on the district· court's power to appoint lead counsel would require, as does the common fund doctrine, control over a fund or jurisdiction over the parties and a finding of benefit-in-fact. Accordingly, we deem it unnecessary to resolve at this time the question raised here.

creation of the committee of lead counsel followed closely the guidelines set forth in the Manual for Complex Litigation § 1.92. Indeed, the purpose of that section—to insure the orderly disposition of the actions with economy of time, money and effort for the court, counsel and the parties—was largely fulfilled in this case.[16]

V

The orders directing that the Special Class Fund be disbursed free of the claims of Jewel Vincent and the clients of Mr. Demanes are reversed. Those appellants are entitled to a return of their contribution to the Fund, plus interest. All other orders involved in this appeal are affirmed.[17]

16. Because the appellants do not challenge the district court's percentage-of-the-gross-recovery approach to the award of attorneys' fees, we have no need to consider its propriety here. Our decision should not be read, however, as an approval or disapproval of that approach. *See City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974); *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir. 1973); *Lockheed Minority Solidarity Coalition v. Lockheed Missiles & Space Co.*, 406 F.Supp. 828 (N.D.Cal.1976); Dawson, *supra* note 5, 88 Harv.L.Rev. at 922–30.

17. The Fifth Circuit has just recently filed an opinion in a case similar to the present case.

*In re Air Crash Disaster at Florida Everglades*, 549 F.2d 1006 (5th Cir. 1977). There the court held (1) that the district court had the authority to appoint lead counsel to conduct discovery and related chores in consolidated cases arising out of an air crash disaster; (2) that that authority included the power to order compensation for lead counsel from the fees received by nonlead counsel; and (3) that the common fund doctrine was also applicable to sustain the award of attorneys' fees. Thus, the independent analysis of our brethren of the Fifth Circuit coincides with ours with respect to their first and third holdings. In the case before us we did not reach the issue resolved by their second holding. *See* note 15 *supra*.