## In re SAN JUAN DUPONT PLAZA HOTEL FIRE LITIGATION.

### No. MDL–721.

United States District Court,
D. Puerto Rico.

June 21, 1991.

See also 742 F.Supp. 717, 745 F.Supp. 79.

Plaintiffs' Steering Committee, Ana Luisa Navarro, Liaison, Hato Rey, P.R., for plaintiff.

TABLE OF CONTENTS

ORDER NO. 346
IN THE MATTER OF THE FIRST DISTRIBUTION
OF SETTLEMENT AWARD

I. INTRODUCTION ..................................................... 916
 A. Procedural Background ............................................. 916
 B. Factual Background ................................................ 917
 1. The Case...................................................... 917

 2. Plaintiffs' Committee of Attorneys ................................. 918
II. DISCUSSION ...................................................... 920
 A. Contingency Fee Contracts ...................................... 920
 1. Applicable Law ............................................. 920
 2. The Facts .................................................. 922
 B. Evidentiary Hearing ............................................ 923
 1. Applicable Law ............................................. 923
 2. The Facts .................................................. 923
 C. Applicable Standard for Distribution of Fees ..................... 924
 1. Choice of Law .............................................. 924
 2. Historical Overview ......................................... 924
 3. "Hybrid" Case ............................................. 926
 4. First Circuit .............................................. 927
 D. Distribution of Fees in MDL–721 ................................ 928
 1. Percentage Method ......................................... 929
 2. Time-and-Rate Based Method ................................ 930
 a. Number of Hours ........................................ 930
 b. Hourly Rate ............................................ 930
 c. Multiplier .............................................. 931
 d. Support Staff ........................................... 932
 e. Costs .................................................. 933
III. CONCLUSION ..................................................... 936
SCHEDULE A ........................................................ 937
SCHEDULE B ........................................................ 938
SCHEDULE C ........................................................ 938

---

ORDER NO. 346

ACOSTA, District Judge.

## IN THE MATTER OF THE FIRST DISTRIBUTION OF THE SETTLEMENT AWARD

### I. INTRODUCTION

#### A. Procedural Background

Before the Court is the Plaintiffs' Steering Committee (PSC) Petition for an Award of Attorneys' Fees and Costs (docket No. 16172, filed *under seal* on January 31, 1991) as well as several additional proposals that were independently submitted by various PSC members[1] and objections by individual plaintiffs' attorneys[2] to the PSC's petition submitted pursuant to Order No. 308 (docket No. 16249, filed *under seal* on February 12, 1991).[3]

On February 20 and 21, 1991 the Court held a closed hearing during which each PSC member, including the PSC liaison, attested to and justified the hours worked and tasks performed.[4] Each member also

---

**1.** *See* PSC Notice of Filing (docket No. 16258, filed *under seal* on February 13, 1991); Jiménez, Graffam & Lausell's Notice of Filing (docket No. 16313, filed *under seal* on February 15, 1991) and PSC's Notice of Filing (docket No. 16333, filed *under seal* on February 19, 1991). Leave to file documents under seal requested in docket Nos. 16257, 16312 and 16332 is hereby GRANTED.

**2.** For the purposes of this Order, "individual plaintiffs' attorneys" and "individual plaintiffs' counsel" shall refer to those attorneys who are retained to represent plaintiffs and who were not appointed to the PSC as well as PSC members when acting as retained counsel rather than in their role as court-appointed PSC members.

**3.** Oppositions were filed *under seal* by the following attorneys: Carlo Toro & González Man-gual (docket No. 16274); Galva, Látimer, Biaggi (docket No. 16277); Santoni Jiménez (docket No. 16287); H. Sullivan, II (docket Nos. 16290 and 16293); R. Barrios (docket No. 16295); J. Peñagaricano (docket No. 16298); D. Brown (docket No. 16300); V. Zequeira (docket No. 16302); R. Busó (docket No. 16304); H. Anduze (docket No. 16311); D. Miller (docket No. 16315); Moreda & Moreda (docket No. 16318); L. Mellado (docket No. 16321); R. González (docket No. 16322); T. Picó (docket No. 16326); J. Garcia (docket No. 16327); and G. Mariani (docket No. 16340). Leave to file documents under seal requested in docket Nos. 16276, 16286, 16289, 16292, 16294, 16297, 16299 and 16314 is hereby GRANTED.

**4.** *See* Order No. 305 "Setting Hearing on PSC's Request for Attorneys' Fees, Costs and Expenses" (docket No. 16209, filed on February 5, 1991) and Order No. 310 "Procedure to be Uti-

presented the expenses accrued by themselves and their support staff since their appointment to the PSC.[5] Objections to the evidence presented were subsequently filed by individual plaintiffs' counsel.[6]

The Court also ordered that any objections to the fees and expenses submitted by members of the Interim Plaintiffs' Investigative Committee (IPIC)[7] be submitted in writing.[8]

## B. Factual Background

### 1. The Case

The arson fire at the San Juan Dupont Plaza Hotel (Hotel) on December 31, 1986 resulted in ninety-seven (97) deaths and more than one-hundred (100) severe injuries. In total, two-hundred seventy-five (275) suits by two thousand three hundred thirty-seven (2,337) plaintiffs were filed in the Districts of Puerto Rico, California, Connecticut, New York and Texas. More than two-hundred fifty (250) defendants were sued including the limited partnership who owned and operated the Hotel, various insurers, manufacturers who had products in the Hotel, companies which provided various services to the hotel, and the Teamsters Union.

Subsequently, the Judicial Panel on Multidistrict Litigation found that all claims shared common questions of fact and that centralization would serve the convenience of the parties and witnesses and promote a just and efficient trial.[9] It was thereby ordered that all actions outside Puerto Rico be transferred to the District of Puerto Rico and the undersigned was appointed as the transferee judge. This Court consolidated all the transferred actions as well as those filed in this District for pretrial pur-

lized During February 20, 1991 Hearing" (docket No. 16261, filed on February 14, 1991).

5. Furthermore, in the event that fees would be calculated using a different formula, the Court requested individual plaintiffs' counsel to submit fees and expenses incurred during their presentation and/or preparation of the damages cases for the representative plaintiffs and/or for the damages cases scheduled for the Phase II Trial–Damages. *See* Order No. 312, "In the Matter of Fees/Expenses of Individual Plaintiff's Counsel Who Prepared/Presented Damages Case...." (docket No. 16422, filed *under seal* on March 11, 1991). Objections were filed *under seal* by the following attorneys: R. Bieder (docket No. 16434), Garbarini & Scher, P.C. (docket No. 16440), Carlo & Troncoso (docket No. 16445), D. Brown (docket No. 16448), L. Mellado (docket No. 16450), W. Gauthier (docket No. 16451), Moreda & Moreda (docket No. 16452), H. Sullivan, II (docket Nos. 16461 and 16469), R. Perkins (docket No. 16481), M. Hutton (docket No. 16482), T. Picó (docket No. 16468). Leave to file documents under seal requested in docket Nos. 16433, 16439 and 16460 is hereby GRANTED. The representative plaintiffs were designated in Order No. 187 (docket No. 10438, filed on May 31, 1989) and the plaintiffs who were to present their damages cases for the Phase II–Damages Trials were designated in Order No. 294 (docket No. 16086, filed on January 11, 1991).

6. The deadline to file objections to evidence presented during the hearing of February 20–21, 1991 was changed from February 26, 1991 to March 1, 1991. *See* Order No. 311 "Amending Order No. 310 In the Matter of Objections to PSC Members' Fees" (docket No. 16344, filed *under seal* on February 25, 1991). Objections were filed *under seal* by the following attorneys: H. Nachman (docket No. 16377), G.R. Thornton, Jr. (docket Nos. 16378, 16379), R. Bieder (docket No. 16381), Bailey and Broder (docket No. 16382), Carlo–Toro & González (docket No. 16384), E. Santoni (docket No. 16386), J.A. Pagán (docket No. 16387), J. Ortiz–Brunet (docket No. 16389), P. Berkowitz (docket No. 16391), Moreda & Moreda (docket No. 16392), Jiménez, Graffam & Lausell (docket No. 16394), G. Mariani (docket No. 16395), Will Kemp (docket No. 16396), W. Gauthier (docket No. 16397), Waite, Schneider ... (docket No. 16398), Látimer, Biaggi ... (docket No. 16400), J. De La Cruz Skerrett (docket No. 16401) and Nachman & Fernández–Sein's Reply to Jiménez, Graffam & Lausell (docket No. 16415). Leave to file documents under seal requested in docket Nos. 16376, 16380, 16383, 16385, 16388, 16390, 16393, 16399 and 16416 is hereby GRANTED.

7. *See* "First Omnibus Order" (docket No. 1, filed on January 21, 1987) naming thirteen (13) IPIC members. The cost and expenses of IPIC members who were not appointed as PSC members have been on file for review by plaintiffs' counsel at the PSC office.

8. An opposition was filed by Teresita Picó Vidal, Esq. (docket No. 16467).

9. On May 13, 1987, one case was transferred for consolidated pretrial proceedings in the District of Puerto Rico pursuant to 28 U.S.C. § 1407. *See* docket No. 142A, filed on May 13, 1987.

poses.[10] At the completion of discovery, transferred cases were consolidated for all purposes, including trial, pursuant to 28 U.S.C. § 1404(a).[11]

2. Plaintiffs' Committee of Attorneys

Due to the large and unmanageable number of plaintiffs' retained counsel[12] and pursuant to its inherent powers to manage and control disposition of causes on its docket, the Court appointed a Committee of lead counsel to coordinate all efforts on behalf of the several thousand plaintiffs. *In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 549 F.2d 1006 (5th Cir.1977), and Rule 42(a) of the Fed.R.Civ.P.[13] The main purpose of this Committee was the enlistment of a group of experienced and energetic attorneys to prosecute those portions of the case common to all plaintiffs and thus avoid excessive costs and overburdening of the Court's limited resources.

In prior mass disaster litigations and large class action suits, the stratagem of utilizing committees of attorneys has proven beneficial.[14] Clearly, the full and active participation of all individual plaintiffs' counsel in pretrial activities and during trial would prove duplicative, overlapping and a gross waste of resources and could serve to unjustly delay access to judicial resources for others.[15] *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759, 773 (9th Cir. 1977); *In re Air Crash Disaster at Flor-*

*ida Everglades on December 29, 1972*, 549 F.2d at 1013.

At the time, the Court found that the necessity and utility of employing this tool would promote the efficient and rapid completion of the case while providing the Court and the plaintiffs with responsible advocacy. The benefits derived from a committee of attorneys would outweigh any prejudices which could otherwise occur to individual counsel or their clients in limiting their participation. Full participation by each individual plaintiffs' counsel would likely result in numerous attorneys each vying for the attention of the Court, zealously representing the interests of their individual cases and possibly leading to the presentation of confusing and conflicting theories. Clearly, this would be detrimental to the interests of the larger group of plaintiffs. Experience has shown that this small cadre of attorneys, as compared to the free-for-all participation of all attorneys, has better served the interests of all parties as well as those of the Court.

The Court initially appointed the Interim Plaintiffs' Investigative Committee (IPIC) to conduct an immediate post-fire investigation of the hotel and to ensure the marking and preservation of all the necessary evidence.[16] Shortly thereafter, the Court initiated a process among all interested plaintiffs' counsel for the formation of the Plaintiffs' Steering Committee (PSC). This Committee would coordinate and conduct all pretrial and trial matters.[17]

---

**10.** *See* Pretrial Order No. 20 (docket No. 591, filed on November 25, 1987) p. 1.

**11.** *See* Pretrial Order No. 130 (docket No. 7400, filed on December 21, 1988).

**12.** There are fifty-six (56) individual plaintiffs' attorneys on record.

**13.** Fed.R.Civ.P. 42(a) reads as follows:
(a) Consolidation
When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated, and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay. (Emphasis added).

**14.** *See* Manual for Complex Litigation, Second, § 20.22 (1985).

**15.** For the larger part of this case, during 1987 through April 1990, this Court was also handling a full docket of over two hundred (200) criminal and civil cases.

**16.** *See* footnote 7.

**17.** The Court also found it advantageous for discovery purposes to coordinate efforts on behalf of all defendants. Accordingly, the Court ordered the appointment of the Defendants' Discovery Committee. *See* Pretrial Order No. 20 (docket No. 591, filed on November 25, 1987). Although the Court articulated the necessary qualifications as well as the application process and filing of objections by defendants, the defendants themselves selected the ten (10) members of the Committee and determined their compensation. *See* Order No. 29 (docket No. 979, filed on January 14, 1988). This Committee only functioned through the discovery stage;

The criteria employed by the Court for the selection of the PSC members included the availability of financial and physical (e.g. office facilities) resources, willingness to commit the necessary time to the case on a long-term basis, ability to work cooperatively and professional experience in similar cases. In addition, the Court sought to include both local and stateside counsel.

Approximately forty (40) applications were received.[18] The names of all the applicants were published and a deadline was set for the filing of objections to the nominees. The Court then carefully reviewed and evaluated the credentials of each applicant until it was satisfied with the selection of the nine (9) members [19] that formed the original Committee.[20] Subsequently, two (2) more members [21] were selected, upon an unanimous recommendation by the PSC members. These additional members were necessary to meet the demands of the increasingly complex litigation both in this forum and in the Commonwealth Court as well as for the coordination of ongoing settlement efforts.[22]

In addition, the Court established the terms of appointment for PSC members and set guidelines for the basic structure of the Committee including the appointment of officers, the duties and responsibilities of each officer, the calling of regular meetings and the creation of by-laws. The duties and responsibilities of the Committee were numerous and included initiating, coordinating and conducting pretrial liability and damage discovery on behalf of all plaintiffs; attending and acting as spokesperson(s) on behalf of all plaintiffs during all pretrial proceedings; submitting proposals, suggestions, schedules, motions and joint briefs on behalf of all plaintiffs pertaining to all pretrial and trial proceedings, coordinating all trial activity; exploring, developing and pursuing all settlement options, etc.

To assist the PSC's efforts, the Court ordered the appointment of a plaintiffs' liaison to head the PSC Office.[23] The liaison was responsible for maintaining a document depository which included the establishment of a comprehensive and up-to-date filing and indexing system containing all the documents generated throughout the case; maintaining a current service list; effectuating service of documents upon all plaintiffs' counsel; filing of documents on behalf of the PSC members; and providing plaintiffs' counsel with any an all documents for duplication and/or inspection upon request.[24]

subsequently defendants organized their efforts through the "Center for Public Resources" (CPR). *See also* footnote 60. In addition, the Court ordered the appointment of a defendants' liaison person and the establishment of an office which had similar duties to the PSC Office. Payment for these services was made by various assessments levied against all defendants. *See* Order Nos. 20 (docket No. 591, filed on November 25, 1987), 37 (docket No. 1057, filed on January 25, 1988) and 127 (docket No. 7100, filed on December 2, 1988).

18. *See* Pretrial Order No. 1 (docket No. 21, filed on February 9, 1987) which sets forth the criteria as well as the process by which applications and objections were to be filed.

19. *See* Pretrial Order No. 2 (docket No. 95, filed on March 18, 1987) appointing the nine (9) PSC members who include: Peter Berkowitz, Esq., Stanley M. Chesley, Esq., Wendell H. Gauthier, Esq. (Chairperson), David C. Indiano, Esq. (Secretary), Will Kemp, Esq., Harvey B. Nachman, Esq., Jorge Ortiz–Brunet, Esq., Jorge M. Suro-Ballester, Esq., Francisco M. Troncoso, Esq. The position of co-chairperson was filled on a rotating basis every six (6) months. In addition,

Antonio Moreda Toledo, Esq. was appointed as an alternate in the event that a vacancy would arise.

20. The selection process brought to mind the quote: "Many are called but few are chosen." Matthew 22:14.

21. *See* Pretrial Order No. 91 (docket No. 3172, filed on June 22, 1988) naming Alvaro Calderón, Esq. and John J. Cummings, III, Esq. as PSC members.

22. The decision to appoint additional members or reduce the size of the Committee was exclusively reserved by the Court. *See* Pretrial Order No. 2 (docket No. 95, filed on March 18, 1987) p. 5.

23. Ms. Ana Luisa Navarro was appointed pursuant to Pretrial Order No. 5 (docket No. 143, filed on May 27, 1987).

24. *See* Pretrial Order No. 2 (docket No. 95, filed on March 18, 1987) & Order No. 127, Case Management Order (docket No. 7100, filed on December 2, 1988) pp. 61–62.

The effectiveness of the PSC is evident in the work accomplished during the four and one-half (4½) years since the fire. During that time, an extensive discovery schedule was completed as well as two trial phases litigated. Discovery began on March 7, 1988 and was completed in record time on December 15, 1988, lasting only 9 months. At the height of discovery, nineteen (19) tracks of depositions were occurring simultaneously.

The Phase I Trial, which involved complex alter-ego theories regarding the interest of the Dupont Hotel members,[25] began on March 15, 1989 and ended with a settlement approximately nine (9) weeks later. The Phase II Trial began a short time thereafter, on June 27, 1989, and lasted fifteen (15) months, ending with a jury verdict. This phase involved the issue of products and services defendants' liability. Claims for nine (9) of eighty-nine (89) defendants went to verdict and four (4)[26] were found liable for the damages presented by ten (10) of the twelve (12) representative plaintiffs.[27] The Phase II Damages–Trial was to begin on February 21, 1990, however, the PSC and those defendants found liable as a result of the Phase II Trial reached a settlement prior to the first damages trial, thereby eliminating the need for the presentation of more than twenty-three hundred (2,300) additional plaintiff damages cases. The final phase, the Phase III Trial which involves claims against several Dupont Hotel members' insurers, is currently being prepared for trial.

Those who were selected as members to the PSC proved competent and well deserve the praise of the Court and fellow counsel. The outstanding work and success achieved by these eleven (11) individuals was beyond the expectations of the Court and crucial to the effective management of the case.[28] Without such hard work, skill and dedication, undoubtedly what has been achieved in the four and one-half (4½) years would have taken a considerably longer period of time and would have proved unduly burdensome and complicated.

Since appointment, the PSC members have not been awarded attorney fees. The Court had indicated that payment of attorney fees for the work completed by the PSC would be determined at some point close to completion of the case and awarded from a percentage of the settlement funds. Although the case is not yet completed, the Court finds it only fair to now distribute the considerable funds generated by successful settlement efforts to the parties as well as to counsel for their attorney fees.[29]

## II. DISCUSSION

### A. Contingency Fee Contracts

#### 1. Applicable Law

 The District Court has broad equitable powers to supervise the collection of attorney fees and monitor contingency fee agreements. *Dunn v. H.K. Porter Co.*, 602 F.2d 1105 (3rd Cir.1979); *Cappel v. Adams*, 434 F.2d 1278 (5th Cir.1970). However, it is an abuse of discretionary power for the Court to allow a contingency fee contract without assuring its conformity with the American Bar Association

---

**25.** The Dupont Hotel members consisted of a group of limited partnerships which held various interests in entities allegedly linked to the operation and management of the San Juan Dupont Plaza Hotel.

**26.** These defendants, collectively referred as "the Airwall defendants," were found liable under the successor liability theory and included: White Consolidated Industries, Inc., Aircoustic Wall Manufacturing Co., ACW Airwall, Inc. and Hufcor, Inc.

**27.** During the Phase I and Phase II Trials, the testimony of 313 witnesses was presented and 1,455 exhibits admitted.

**28.** For a comprehensive review of the myriad tasks accomplished by the PSC, *see* PSC Petition for an Award of Attorneys' Fees and Costs (docket No. 16172, filed *under seal* on January 31, 1991).

**29.** Because the Phase III Trial is yet to be completed, subsequent distributions will be necessary. The distribution formula utilized here will not necessarily be followed in any future disbursements.

(ABA) Canons of Professional Ethics.[30] *Hoffert v. General Motors Corp.*, 656 F.2d 161, 165 (5th Cir.1981); *cert. denied*, 456 U.S. 961, 102 S.Ct. 2037, 72 L.Ed.2d 485 (1982).

■ Even when an attorney can show that a client signed a contingency fee agreement, "[the] court is not required to give 'blind deference' to contractual fee agreements and must ultimately be responsible for fixing a reasonable fee for the judicial phase of the proceedings." *Ramos Colón v. Secretary of Health & Human Services*, 850 F.2d 24, 26 (1st Cir.1988).

■ Furthermore, it is indisputable that district courts have the inherent power to supervise and manage the disbursement of attorney fees from settlement awards. *Dunn v. H.K. Porter Co.*, 602 F.2d at 1109. When fee awards are to be paid from settlement funds, the Court has an independent duty to scrutinize the reasonableness of contingency fee contracts. *Rosquist v. Soo Line R.R.*, 692 F.2d 1107, 1111 (7th Cir.1982); *Hoffert v. General Motors Corp.*, 656 F.2d at 165.

■ Generally, courts should be reluctant to intrude into contractual relationships between attorney and client. *Dunn v. H.K. Porter Co.*, 602 F.2d at 1112. However, special concerns of possible oppression and overreaching by an attorney require that contingency fee contracts be scrutinized more carefully than ordinary commercial contracts and, where necessary, that they not be fully enforced. *McKenzie Const., Inc. v. Maynard*, 758 F.2d 97, 101 (3rd Cir.1985); *Krause v. Rhodes*, 640 F.2d 214, 220 (6th Cir.) *cert. denied*, 454 U.S. 836, 102 S.Ct. 140, 70 L.Ed.2d 117 (1981); *Allen v. U.S.*, 606 F.2d 432, 435 (4th Cir.1979); *Spilker v. Hankin*, 188 F.2d 35, 39 (D.C.Cir.1951).

■ The ABA Code of Professional Responsibility recognizes that an attorney is free to enter into a contingency fee contract. However, this is qualified by the proviso that such contracts are subject to court review for reasonableness.[31] *Schlesinger v. Teitelbaum*, 475 F.2d 137, 141 (3rd Cir.), *cert. denied*, 414 U.S. 1111, 94 S.Ct. 840, 38 L.Ed.2d 738 (1973); *Fitzgerald v. Freeman*, 409 F.2d 427 (7th Cir.), *cert. denied*, 396 U.S. 875, 90 S.Ct. 151, 24 L.Ed.2d 134, *reh'g denied*, 396 U.S. 976, 90 S.Ct. 425, 24 L.Ed.2d 447 (1969). The fee must prove fair under the circumstances of the case. *Allen v. U.S.*, 606 F.2d at 435; *Dunn v. H.K. Porter Co.*, 602 F.2d at 1110. This is not limited to whether the arrangement was reasonable when made but also the correlation between the amount received by the attorney and the work done. *Farmington Dowel Products Co. v. Forster Mfg. Co.*, 436 F.2d 699, 701 (1st Cir. 1970).

■ Likewise, reasonableness of an attorney fee is not limited to a finding that

**30.** Canon 13 reads as follows:
A contract for a contingent fee, where sanctioned by law, should be reasonable under all the circumstances of the case, including the risk and uncertainty of the compensation, but should always be subject to the supervision of a court, as to its reasonableness.

**31.** *See, e.g.,* Disciplinary Rule 2–106 which reads in part:
(A) A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.
(B) A fee is clearly excessive when, after a review of the facts a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:
(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.
(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.
(3) The fee customarily charged in the locality for similar legal services.
(4) The amount involved and the results obtained.
(5) The time limitations imposed by the client or by the circumstances.
(6) The nature and length of the professional relationship with the client.
(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.
(8) Whether the fee is fixed or contingent.
*See also,* Rule 1.5, ABA Model Rules of Professional Conduct.

the contract is reasonable on its face. The court must also consider the circumstances surrounding both the negotiation and the performance of the contingency fee contract, *McKenzie Const., Inc. v. Maynard,* 758 F.2d at 101, including the manner in which the contract was entered; the status and sophistication of the plaintiff; whether the source of the payment is a settlement fund or a tax against the defendants; the size of the proposed award; and, whether the fee allowed is sufficient to encourage capable counsel to undertake similar litigation in the future. *Dunn v. H.K. Porter Co.,* 602 F.2d at 1110. The fact that the client acquiesced or approved the fee contract, although relevant, is not controlling to the consideration of the reasonableness of the agreement. *Farmington Dowel Products Co. v. Forster Mfg. Co. Inc.,* 436 F.2d at 701.

■ If the Court finds that a fee agreement provides for an unethically excessive fee, it may sparingly exercise its supervisory powers to limit the amount an attorney may actually receive. *Sargeant v. Sharp,* 579 F.2d 645, 648 (1st Cir.1978).

### 2. The Facts

■ The Court ordered[32] plaintiffs' counsel to submit copies of their respective contingency fee contracts for review.[33] Pursuant to its inherent powers and in light of the particular facts surrounding this case, the Court ordered the automatic modification of those contingency fee contracts which exceeded twenty-five percent (25%) for each minor and incompetent plaintiff claim and thirty-three percent (33%) for each adult client's award in this case. These percentages are the maximum award counsel can recover for their fees.[34] Counsel who were parties to contracts containing higher fee percentages were to file petitions showing cause as to why the terms should not be modified by the Court.[35]

Due to the enormity of this case and the subsequent Court appointment of a Plaintiffs' Steering Committee, the actual effort extended throughout the nine (9) week Phase I Trial and the fifteen (15) month Phase II Trial by any single individual plaintiff's counsel was relatively minimal.

Furthermore, the tasks performed by the individual plaintiffs' counsel since the beginning of the case included, generally, the filing of initial complaints, discovery limited to damages for his/her respective client, negotiation with the settlement judge to set the value of the case, monitoring the case, securing client releases, and communication with the client.

Given the above, equity and fairness mandates that a ceiling of twenty-five percent (25%) per minor and incompetent plaintiff's award and thirty-three percent (33%) for all other plaintiffs' awards be set as attorney fees.[36]

---

**32.** *See* Settlement Order No. 145 (docket No. 16181, filed on February 1, 1991), Order No. 316 (docket No. 16495, filed on April 3, 1991) and Order No. 319 (docket No. 16517, filed *under seal* on April 11, 1991).

**33.** There are fifty-six (56) plaintiffs' counsel who executed two thousand, one hundred thirty-one (2,131) different attorney-client contingency fees contracts for actions originally filed in four (4) states, in addition to the Commonwealth of Puerto Rico.

**34.** Two hundred thirty-one (231), or ten point eighty-four percent (10.84%), contingency fee contracts exceeded the maximum set by the Court.

**35.** *See* Order No. 319 (docket No. 16517, filed on April 11, 1991). A single petition was filed which involved the attorney fee to be awarded from a plaintiff represented as incompetent in the complaint pending Court certification. *See* Civil No. 87–0006 Notice of Filing (docket No. 16528, filed on April 15, 1991). Leave to file documents under seal requested in docket No. 16527 is hereby GRANTED. The request for a fee award to exceed twenty-five percent (25%) of the incompetent plaintiff's award in hereby DENIED.

**36.** In addition, the Commonwealth of Puerto Rico prohibits an attorney from charging contingency fees for services rendered in excess of twenty-five percent (25%) of the award received by a minor or mentally disabled client and thirty-three percent (33%) of the award received by every other client. Where good cause is shown, the Court has the discretion to allow up to a thirty-three percent (33%) contingency fee of the final proceeds received by a minor or mentally disabled client. *See* P.R. Laws Ann. tit. 4, § 742 (1978).

## B. Evidentiary Hearing

### 1. Applicable Law

Litigants are encouraged to reach an agreement on attorney fees where possible. Where the parties are unable to settle the matter, the party requesting fees may so petition the district court, but bears the burden of establishing entitlement of the award requested. However, "[a] request for attorney's fees should not result in a second major litigation." *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 951 (1st Cir.1984), *quoting Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983). The determination of attorney fees does not demand that the district court become so deluged with details that it is not possible to view the petitions for award in the proper perspective. *Gabriele v. Southworth*, 712 F.2d 1505, 1507 (1st Cir.1983). However, the Court has the duty to enter concrete findings of fact and clear explanations of its reasons for the fee award. *Jacobs v. Mancuso*, 825 F.2d 559, 562 (1st Cir.1987) citing *Grendel's Den*, 749 F.2d at 950 and *Hensley*, 103 S.Ct. at 1941).

A formal evidentiary hearing, providing for participation by all parties, is preferable though not absolutely required in every instance where attorney fees are contested. *See Calhoun v. Acme Cleveland Corp.*, 801 F.2d 558, 560 (1st Cir.1986) citing *Kargman v. Sullivan*, 589 F.2d 63, 67 (1st Cir.1978). *But see, City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 468 (2nd Cir.1974) (an evidentiary hearing is required where the facts to be weighed in determining the attorney fee award are in dispute).

### 2. The Facts

To assist the Court in determining attorney awards, the PSC presented two full days of testimony in support of the petition for fees.[37] The information gathered included, but was not limited to, each PSC member's hourly billing rate, academic background, litigation experience and summary of tasks performed since appointment to the Committee.

Although a few individual plaintiffs' attorneys requested a full-fledged hearing,[38] these requests were denied by the Court. Instead, the parties were given an opportunity to file motions on the subject.[39] Due to the grand scale of this case, i.e., the large number of attorneys involved and the tasks performed and hours logged by the PSC members and their staff,[40] the Court found that such a hearing would not only be unmanageable but unlikely to produce the desired results.

Furthermore, reports containing the total PSC attorney hours and expenses incurred were available to all plaintiffs' counsel for review throughout the duration of the case. To assist the Court, a certified public accountant was appointed to audit and submit, for Court approval, periodic reports of the PSC time records and expenditures in accordance with the guidelines set forth by the Court. In addition to filing these re-

37. Although the hearing was closed, PSC members and their representatives, individual plaintiff counsel and plaintiffs were allowed to attend. Furthermore, the sealed transcripts were made available to these parties upon request.

38. *See* Richard A. Bieder's Request for Amendment of Order No. 310 (docket No. 16335, filed on February 20, 1991) denied in open Court. *See also*, Order No. 308 (docket No. 16249, filed *under seal* on February 12, 1991) footnote 1, disposing of motion by Antonio Moreda, Esq. (docket No. 16230, filed *under seal* on February 8, 1991) and opposition by PSC (docket No. 16249, filed *under seal* on February 12, 1991).

39. Individual plaintiffs' counsel filed their initial objections to PSC requests for distribution (*see* motions listed in footnote 3) which were addressed by the PSC members in their presentation of evidence during the hearings to the satisfaction of the Court and will not be repeated here. Subsequent to the hearings, individual plaintiffs' counsel again filed objections (*see* motions listed in footnote 6) which will be addressed in the relevant sections of this Order.

40. Although only eleven (11) PSC members were selected, approximately 11 partners, 75 associates, 38 paralegals and 41 law clerks from the PSC member's law firm participated due to the demands of the fast-paced discovery and litigation schedule set by the Court and the complexity of the issues. There were 65,075.29 PSC/IPIC member hours; 48,738.80 other attorney hours; and, 52,085.20 paralegal and law clerk hours logged in this case.

ports with the Court together with a complete set of contemporaneous time sheets and receipts for expenses, a second copy was submitted to the PSC Office and made available for review by any member and/or individual plaintiff's counsel.

### C. Applicable Standard for Distribution of Fees

#### 1. Choice of Law

As a preliminary matter, the Court must decide whether to apply local or federal law in determining the distribution of attorney fees. In diversity cases, attorney fees are a substantive issue and state law controls. *Alyeska Pipeline Service Co. v. Wilderness Soc.*, 421 U.S. 240, 259, n. 31, 95 S.Ct. 1612, 1622, n. 31, 44 L.Ed.2d 141 (1975) *rev'd* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 *reh'd denied* 439 U.S. 885, 99 S.Ct. 231, 58 L.Ed.2d 200 (1978). However, where state law is devoid of sufficient criteria or is silent or incomplete on the calculation of attorney fees, as is the case here, federal standards become relevant.[41] *Blanchette v. Cataldo*, 734 F.2d 869, 878 (1st Cir.1984); *McGinty v. Beranger Volkswagen*, 633 F.2d 226, 232 (1st Cir.1980).

Furthermore, the Court of Appeals for the First Circuit has consistently held that where federal statutes do not otherwise dictate a method for the calculation of attorney fees, the time-and-rate-based approach is to be utilized. *U.S. v. Metropolitan Dist. Comm'n*, 847 F.2d 12, 15 (1st Cir.1988); *Segal v. Gilbert Color Systems, Inc.*, 746 F.2d 78, 85 (1st Cir.1984).

Accordingly, federal standards and, in particular, those developed by the Circuit Court of Appeals for the First Circuit will be utilized to determine the proper attorney fees in this case.

#### 2. Historical Overview

Court awarded fees are divided into two separate and distinct types: statutory fee awards and common fund fee awards.[42] Statutory fees, governed by legislative intent, are awarded to the prevailing party and paid by the defendant. In effect, these fees ensure that the plaintiff is made whole for vindicating his/her statutory right. Although viewed as an added damage, the assessment of this fee award is somewhat restrained as the purpose is not to overly punish the defendant.

On the other hand, the distribution of fees from a common fund, an identifiable asset resulting from litigation over which the court has legitimate authority or control, is based on the equitable principles that those who share in the benefit derived from the work of others should also share in the expenses that were incurred while producing those benefits. Accordingly, attorney fees are based on a percentage of the common fund entrusted for the benefit of a group of plaintiffs. The principles of unjust enrichment and quantum meruit[43] serve as a basis for the distribution of attorney fees and litigation costs among the beneficiaries of a common fund.

---

**41.** A review of the laws of the Commonwealth of Puerto Rico show that attorney fees are not statutorily regulated in circumstances where a common fund is created, except in class actions by consumers of goods and services pursuant to P.R. Laws Ann. tit. 32, §§ 3341–43 (1990) & tit. 23, § 1016 (1987).

**42.** The brief description which follows is based on a presentation by Professor Arthur Miller during the evidentiary hearing conducted on February 20, 1991. For an overview of the history and problems encountered when determining fees in various types of cases, *see Court Awarded Attorney Fees*, 108 F.R.D. 237 (1985).

**43.** "Expression "Quantum meruit" means "as much as he deserves" and it is an expression that describes the extent of liability on a con-

tract implied by law. An equitable doctrine, based on the concept that no one who benefits by the labor and materials of another should be unjustly enriched thereby; under those circumstances, the law implies a promise to pay a reasonable amount for the labor and materials furnished, even absent a specific contract therefor. Essential elements of recovery under quantum meruit are: (1) valuable services were rendered or materials furnished, (2) for person sought to be charged, (3) which services and materials were accepted by person sought to be charged, used and enjoyed by him, and (4) under such circumstances as reasonably notified person sought to be charged that plaintiff, in performing such services, was expected to be paid by person sought to be charged." (Citations omitted). Black's Law Dictionary 1119 (5th ed. 1979).

As early as the 1980's, federal courts have been invoking their inherent equitable powers to determine fee awards. *Trustees v. Greenough*, 105 U.S. 527, 26 L.Ed. 1157 (1881); *Central Railroad & Banking Co. of Georgia v. Pettus*, 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885). This power was articulated in an opinion written by Justice Frankfurter:

> Plainly the foundation of the historic practice of granting reimbursement for costs of litigation other than the conventional taxable costs is part of the original authority of the chancellor to do equity in a particular situation. Whether one professes to sue representatively or formally makes a fund available for others may, of course, be a relevant circumstance in making the fund liable to his costs in producing it. But when such fund is for all practical purposes created for the benefit of others, the formalities of the litigation, the absence of an avowed class suit or the creation of a fund, as it were, through stare decisis rather than through a decree hardly touch the power of equity in doing justice as between a party and the beneficiaries of his litigation.

*Spraque v. Ticonic National Bank*, 307 U.S. 161, 166–67, 59 S.Ct. 777, 780, 83 L.Ed. 1184 (1939). *See also, Boeing Company v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980) (persons who obtain the benefit of a lawsuit without contributing to its costs would be unjustly enriched at the successful litigant's expense).

Awarding a percentage of the common fund derived from the case had been the usual method for the determination of fee awards until the late 1960's when the time-and-rate based method was introduced to curb abuses and/or overcompensation which may result from the use of the straight percentage of the fund generated by the case.

At that time, the Third Circuit took the lead and developed the "lodestar approach" whereby the critical factor in determining a reasonable fee is the determination of an appropriate hourly rate multiplied by the number of hours expended by the attorney to achieve the results. *See Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3rd Cir.1973), *appeal following remand*, 540 F.2d 102 (3rd Cir. 1976). Once the lodestar figure is reached, the district court may adjust the fee upward or downward depending upon the contingent nature or apparent risks of the case and the quality of the attorney's work.

The Fifth Circuit took a somewhat different approach. The Court of Appeals identified twelve factors to be used in determining the proper value of an attorney's fee. *See Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974).[44] This method was later adopted by the Eighth, Ninth and D.C. Circuits.[45]

Despite their heralded differences, the *Johnson* and *Lindy* methods do not differ greatly in practice. The factors articulated by the Fifth Circuit overlap and are subsumed by those considered in the application of the lodestar approach and subsequent consideration/application of a multiplier.

---

**44.** The twelve (12) factors are highlighted by the Fifth Circuit in *Johnson* are:

1. the time and labor required;
2. the novelty and difficulty of the questions;
3. the skill requisite to perform the legal service properly;
4. the preclusion of other employment by the attorney due to acceptance of the case;
5. the customary fee;
6. whether the fee is fixed or contingent;
7. time limitations imposed by the client or the circumstances;
8. the amount involved and the results obtained;
9. the experience involved and the results obtained;
10. the "undesirability" of the case;
11. the nature and length of the professional relationship with the client; and,
12. awards in similar cases.

**45.** *See Finney v. Hutto*, 548 F.2d 740 (8th Cir. 1977) *aff'd* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) *reh'g denied* 439 U.S. 1122, 99 S.Ct. 1035, 59 L.Ed.2d 83 (1979); *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67 (9th Cir. 1975), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976); *Evans v. Sheraton Park Hotel*, 503 F.2d 177 (D.C.Cir.1974).

The time-and-rate based (lodestar) method was utilized by the courts to determine attorneys fees for both statutory and common fund cases during the thirteen years which followed. However, in 1984, the Supreme Court drew a distinction between the use of the two methods. While reviewing what constituted "reasonable fees" in a civil rights case, the Supreme Court established that the lodestar method was the preferred method in statutory cases and, in a footnote, the Court indicated that the normative method for the determination of attorney fees in common fund cases continues to be a straight percentage of the fund generated. *See Blum v. Stenson*, 465 U.S. 886, 900, n. 16, 104 S.Ct. 1541, 1550, n. 16, 79 L.Ed.2d 891 (1984).[46]

### 3. "Hybrid" Case

■ Few courts have addressed the particular "hybrid" situation whereby the Court must allocate attorney fees for lead counsel from the fees generated by third-party contingency fee contracts between individual plaintiffs' counsel and their client(s). Unlike a pure common fund case, the circumstances in this case differ in that the Court found it necessary to assign additional responsibilities to a small group of lead counsel, chosen from all retained attorneys. Because it is those retained counsel who benefited from this group's work, payment to lead counsel is effectuated by the shifting of fees from retained counsel to lead counsel, thereby preventing double billing for attorney fees to the clients. As this case does not fit into the mold of a pure common fund case and is not governed by statutory authority, the question becomes one of which method to apply, the lodestar or the percentage?

Several other mass disaster litigation cases, with similar circumstances, have resolved the issue by utilizing the percentage or lodestar method or a combination of both. Both Courts of Appeals for the Fifth and Seventh Circuit have affirmed lower court decisions which have shifted fees from individual counsel to lead counsel groups appointed by the Court pursuant to consolidation of cases for pretrial and other purposes. For instance, the Fifth Circuit upheld the decision of the lower court to allow attorney fees and expenses for lead counsel equal to eight percent (8%) of each plaintiffs' award, to be deducted from fees of retained counsel, but remanded for further articulation utilizing the *Johnson* factors. *In re Air Crash at Florida Everglades on December 29, 1972*, 549 F.2d 1006 (5th Cir.1977). In *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759 (9th Cir.1977), the Court of Appeals affirmed the allocation of five percent (5%) of each plaintiffs' award, derived from attorney fees generated by retained counsel, for attorney fees incurred by lead counsel appointed by the court.

Several District Courts in other mass disaster litigation cases have also followed suit. In a multidistrict case with similar facts as the case at bar, a district court allocated seven percent (7%) of the settlement funds for lead counsels' attorney fees, deducted from the pool of retained attorneys' fees, and then utilized the lodestar approach to further divide the fees among the lead counsel members, *In re MGM Grand Hotel Fire Litigation*, 660 F.Supp. 522 (D.Nev.1987); while another court awarded attorney fees for lead counsel utilizing the lodestar approach and reduced the referring attorney fees to a maximum of six and three-tenths percent (6.3%) of plaintiff's award, *In re Beverly Hills Fire Litigation*, 639 F.Supp. 915 (E.D.Ken. 1986).

Although the proper approach to be utilized in these hybrid cases has not been specifically addressed by the Supreme Court or the First Circuit, the Court finds that the use of both the percentage and lodestar approach is both logical and practical and will lead to a fair and reasonable

**46.** Since *Blum*, the First Circuit has yet to address the issue of percentage versus lodestar approach for the determination of attorney fees in a common fund case. *But see, Skelton v. General Motors Corp.*, 860 F.2d 250 (7th Cir. 1988); *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268 (9th Cir.1989); *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301 (9th Cir.1990); and, *Brown v. Phillips Petroleum Co.*, 838 F.2d 451 (10th Cir.1988).

result because one method serves to check the other.

### 4. First Circuit

■ The First Circuit has refused to mandate that district court judges follow an unyielding uniform approach in all fee cases and in effect to sacrifice substance for the sake of theoretical uniformity. *U.S. v. Metropolitan Dist. Comm'n*, 847 F.2d at 15. The determination of what constitutes a reasonable fee rests within the sound discretion of the district court. However, in every case, the single most important consideration is whether the fee request is reasonable. *M. Berenson Co., Inc. v. Faneuil Hall Marketplace, Inc.*, 671 F.Supp. 819, 830 (D.Mass.1987), *following Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986).

The leading case in the Court of Appeals for the First Circuit for determination of attorney fees is *King v. Greenblatt*, 560 F.2d 1024 (1st Cir.1977), *cert. denied*, 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978) (affirmed attorney fees award in case to improve conditions of confinement at a treatment center for sexually dangerous). Essentially, the Court applied the *Johnson* factors in its determination of what constituted a reasonable attorney's fee. The methodology was later modified in *Blum v. Stenson*, 465 U.S. at 898–899, 104 S.Ct. at 1548–1549, where the Supreme Court found that the novelty and complexity of issues are reflected within the number of billable hours and the experience and skill of the attorney is taken into account when determining the reasonable hourly rate. *See also, Wildman v. Lerner Stores Corp.*, 771 F.2d 605, 609 (1st Cir. 1985).

In addition, the First Circuit in *King* found that to award attorney fees, contemporaneous and detailed records of time spent and duties performed in relation to the case submitted by each attorney requesting fees must be fully evaluated by the lower court, 560 F.2d at 1027. *See also Hensley v. Eckerhart*, 461 U.S. at 433, 103 S.Ct. at 1939 (where the documentation of hours is inadequate, the court may reduce the award accordingly); *Calhoun v. Acme Cleveland Corp.*, 801 F.2d 558 (1st Cir. 1986) (decision granting attorney fees remanded because attorney submissions were insufficient as to dates and time for services performed).

■ The hourly rates for attorney awards is an issue of considerable dispute requiring the exercise of judicial judgment. *In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1296 (E.D.N.Y.1985) *aff'd in part, rev'd in part* 818 F.2d 226 (2nd Cir.1987). The Supreme Court found that a reasonable hourly rate for each attorney can be obtained by looking to the prevailing market rate within a particular community for similar services of reasonably comparable skill, experience and reputation. *Blum v. Stenson*, 465 U.S. at 895, n. 11, 104 S.Ct. at 1547, n. 11. Although the customary billing rates are entitled to consideration, the court must view this amount realistically and endeavor to use rates that are adequate to attract competent attorneys while not creating windfalls. *Grendel's Den, Inc. v. Larkin*, 749 F.2d at 950, *citing Hensley v. Eckerhart*, 461 U.S. at 430, n. 4, 103 S.Ct. at 1938, n. 4.

There are various opinions as to what constitutes an adequate hourly rate in mass disaster litigation. These suits necessarily attract attorneys having specialized skills from the district in which the case is being tried as well as other districts. When the hourly rates differ, the court is faced with determining the appropriate hourly rate to apply, i.e. a uniform hourly rate or the actual individual billing rates.

Faced with this situation, the Court in the Eastern District of New York rejected the usual practice of utilizing a uniform rate based on the usual hourly rate of a particular community. Further, the court found that to apply the actual billing rate for each counsel would be complex, time consuming and confusing. *In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. at 1308. Instead, noting the national character of such cases, the Court identified a national rate and obtained results which were essentially neutral to the

fee applicant and fund beneficiaries while simplifying the administrative process.

■■■■■ In reviewing the hours expended by an attorney, the district court shall look to the result obtained and not whether the attorney prevailed on a particular issue to justify an award for those hours. *See e.g., Hart v. Bourque,* 798 F.2d 519 (1st Cir.1986). In a case where multiple claims are pursued and where plaintiffs prevail on some and not on others, plaintiffs' counsel are entitled to fees for hours worked not only on successful claims but also on claims involving a common core of facts or related theories. *Aubin v. Fudala,* 782 F.2d 287 (1st Cir.1986).

■■■■ Furthermore, the Supreme Court has rejected the strict mathematical approach whereby a ratio of issues prevailed upon to issues raised is used in determining the percentage of attorney fees to be awarded. *Hensley v. Eckerhart,* 461 U.S. at 435, 103 S.Ct. at 1940, (the refusal or failure of the court to reach certain grounds is not a sufficient reason for reducing a fee). However, where there is great disparity between the number of issues raised and those upon which the party prevailed, the district court may attempt to identify specific hours that should be eliminated or it may simply reduce the award to account for the limited success. *Hensley v. Eckerhart,* 461 U.S. at 439–440, 103 S.Ct. at 1942–1943.

■■■■ The First Circuit has recognized that the use of the multiplier for an upward adjustment of the fee award is a matter of informed discretion of the district court because the judge is in the best position to assess the difficulties encountered in the context of the case. *Wojtkowski v. Cade,* 725 F.2d 127, 131 (1st Cir.1984). Once the lodestar figure is calculated, the court may apply an upward or downward adjustment to account for the contingent nature of the fee, delay in payment, quality of representation, exceptional or unexpected results, etc. *Furtado v. Bishop,* 635 F.2d 915, 920–921 (1st Cir.1980).

In a later case, the First Circuit further articulated the factors which may be taken into consideration when applying a multiplier because of the contingent nature of the fee, i.e. the risk of nonpayment. In *Wildman v. Lerner Stores Corp.,* 771 F.2d at 610–611, the Court identified several factors including: what, if any, payment the attorney would have received had the suit not been successful; what, if any, costs or expenses an attorney would have incurred had the case been lost; whether the attorney was totally dependent upon the Court for his/her fees; the length of time and number of hours the case demanded during which the attorney was required to compensate his/her associates and carry overhead without assurance of reimbursement; and, whether other attorneys may have refused to take the case because of the risk of nonpayment.

Other courts have considered myriad other factors such as the uncertainty of plaintiffs' ability to prove liability and damages; the length of time and number of hours required before resolution; any applicable public interest incentive; whether the attorney was precluded from taking other work; and, the degree to which the attorney assumed a personal risk of nonpayment for services and/or expenses incurred on behalf of plaintiffs. *See, e.g., Wildman v. Lerner Stores Corp.,* 771 F.2d at 612, and cases cited therein.

## D. Distribution of Fees in MDL–721

At the outset it is important to note that the plaintiffs will not be billed doubly for the legal services received from the PSC and individual plaintiffs' counsel. Instead, the Court will allocate a portion of the attorney fees generated by each retained counsel for payment of PSC's attorney fees.

■■■■ In addition, the PSC's attorney fees will be allocated from the entire pool of funds generated by all contingency fee contracts entered into by claimants in this litigation even though several PSC members have suggested that their fee awards as individual plaintiffs' counsel should be exempt from payment of PSC attorney fees. The Court does not find any viable reason supporting such divergent treat-

ment. All counsel and their clients benefited equally from the services of the PSC and all should share in the cost. The mere fact that an individual plaintiffs' counsel is also a PSC member is hardly enough to support the argument that only non-PSC members should be responsible for the total amount of attorney fees to be paid to the PSC for their services.[47]

### 1. Percentage Method

The total amount generated by settlements reached in this case which is available for disbursement to plaintiffs equals two hundred twenty million, nine hundred eight thousand, five hundred forty-nine dollars and seventy eight cents ($220,908,-549.78).[48] The amount to be disbursed for the PSC's attorney fees totals thirty-five million, eight hundred eighty-four thousand, three hundred sixteen dollars and twenty-three cents ($35,884,316.23) representing sixteen point twenty-four percent (16.24%) of settlement award.[49] (See Schedule A).

■ In the early stages of this litigation, based on the results of the *MGM* litigation, the Court roughly estimated that the attorney fees and authorized PSC expenditures would "probably [be] less than ten percent (10%) ... of the gross settle-ment amount."[50] At that time, the Court did not have the benefit of knowing that the parties would choose the option of extended litigation rather than settlement; two phases of trial lasted longer than eighteen (18) months and a third phase trial is scheduled to commence shortly. In fact, where unforeseen circumstances in a particular case develop, the Court is under a duty to reconsider its prior rulings to determine what impact, if any, these new facts may have upon a prior determination.

The individual plaintiff counsel's alleged reliance upon this nonbinding and general estimate made by the Court or various statements made by PSC members are of no consequence.[51] Each individual plaintiffs' counsel implicitly agreed to accept the benefit of the services provided by the PSC and have neither challenged nor reviewed the records of fees and expenses filed during the course of this case. Had they bothered, even the most cursory review would have led to the conclusion that the Court's prior estimate would not cover reasonable fees and expenses necessitated by the unexpected ensuing active litigation. It is unfortunate and contrary to the Court's sense of fairness that only now, after the fact, when it is time to reimburse the PSC members for their work that the individual plaintiffs' attorneys attack the

---

**47.** Equally unpersuasive and not worthy of discussion is the suggestion by several individual plaintiffs' attorneys that the PSC members should not receive any additional fees other than those generated by their own plaintiffs' cases.

**48.** This amount includes the principal ($213,-218,573.84) plus interest earned through June 21, 1991 ($21,478,722.65), less amount paid to AIU ($7,266,609.87), the amount to be paid to Lyon ($500,000.00) and taxes to be paid on income earned as of June 21, 1991 ($6,022,-136.84). The tax issue shall be discussed under a separate Court Order. In the event that these funds are not due pursuant to a later U.S. Internal Revenue Service determination, they will be refunded to the plaintiffs, less attorney fees. *See* Amended Order No. 342 (docket No. 16931, filed on June 12, 1991).

**49.** Of the fees generated, several individual plaintiffs' attorneys suggested percentages ranging from one percent (1%) to thirty percent (30%) for PSC attorney fees. Unfortunately, the Court found these suggestions to be unenlightening and an exercise in abstract guesswork since counsel neglected to fashion a workable and viable formula for factoring in the number of hours, value for various tasks performed, etc.

**50.** Pretrial Order No. 127 (docket No. 7100, filed on December 2, 1988) p. 48.

**51.** Most objections raised by individual plaintiffs' counsel are based on the PSC members' alleged statements that attorney fees generated by this case would probably not differ from those awarded in *MGM*. Clearly, when the two cases are compared, the most obvious difference is that lead counsel were not forced to expend numerous hours in preparation for or conducting trial as all parties settled quickly. Furthermore, the *MGM* case was not plagued with the factual and legal complexities presented by this case, not in the least of which is that Puerto Rico is a civil law jurisdiction. It is the opinion of this Court that to rely on such representations is ludicrous as the outcome of a case is quite unpredictable, particularly a complex one such as the case at bar.

propriety of the PSC fee request by setting forth such unsubstantiated and unpersuasive arguments.

### 2. Time-and-Rate Based Method

#### a. *Number of Hours*

The distribution of this fund as between the eleven (11) individual PSC members will be determined by the application of the time-and-rate based method and the use of a multiplier. The first step is to determine whether the number of hours expended were reasonable for the tasks achieved. For this, the Court is relying on the reports submitted by the court appointed certified public accountant which have been carefully reviewed.

Throughout the case, the PSC members were required to file contemporaneous and detailed records which set forth the date, description of service, name and title of person providing such service and the time required for the service for every sixty (60) day billing period. In addition, the Court established guidelines prohibiting reimbursement for excessive attendance at conferences, depositions, hearings, etc., thereby limiting attendance to indispensable counsel.[52]

As the various reports were completed, each was filed with the Court for review and approval. Consequently, the final reports filed reflected all modifications as specified by the Court. Therefore, in light of these procedures, with the attendant safeguards, the Court finds that these reports contain an accurate and true account of the hours actually required and expended by each PSC member and their respective staff during this litigation.[53]

■ Several individual plaintiffs' attorneys objected to the number of hours attributable to matters upon which the PSC did not prevail. The Court finds that such reduction is not warranted here as the issues involve a common core of facts and related theories; the fact that the PSC prevailed on one but not all claims does not justify an automatic reduction in fees for the hours spent pursuing unsuccessful claims. In fact, the PSC strategy in aggressively pursuing differing liability theories against the various defendants proved successful in promoting settlement and narrowing issues to be presented to the jury.[54]

#### b. *Hourly Rate*

■ Next, the Court must determine a reasonable hourly rate. There was much discussion concerning the appropriate hourly rate to apply and from which particular community. The question was whether to utilize the rates prevalent for Puerto Rico attorneys or apply the actual billing rates of each PSC member and/or staff. However, to view the community within such narrow demarcations only creates artificial distinctions which unjustly and arbitrarily favors some and disfavors others. Instead, the Court has chosen to identify the community standard as an approximation of the hourly rate paid to attorneys who are known and experienced practitioners in the arena of mass disaster litigation modified, to some degree, by the actual billing rate of those with less experience in this area, i.e., reflecting the comparable skill, experience, and reputation of each PSC member.[55]

---

**52.** *See* Pretrial Order No. 2 (docket No. 95, filed on March 18, 1987) and Pretrial Order No. 127, Amended Case Management Order (docket No. 7100, filed on December 2, 1988) pp. 20–21.

**53.** Many of the objections to the number of hours logged by the PSC and their staff as presented in the individual plaintiffs' counsel motions simply alleged that the PSC hours were duplicative and/or excessive. Because of the lack of specificity, i.e., particular instances are not identified, the Court is neither able nor required to consider these objections.

**54.** The Court reaches this conclusion despite the fact that the plaintiffs only prevailed against four (4) defendants (the Airwall defendant) of the nine (9) defendants who went to verdict.

**55.** During the hearing each member attested to his usual hourly rate. These are as follows: S. Chesley $275–$300; J. Cummings, $225–$250; J. Ortiz–Brunet, $200–$250; W. Gauthier, W. Kemp, H. Nachman, $200; P. Berkowitz, F. Troncoso, $150; A. Calderón, $125–$150; D. Indiano $120–$150; J. Suro Ballester, $125.

The result was the categorization of PSC members into several classifications with varying hourly rates; for example, those with the most skill and experience received two-hundred dollars ($200) per hour, those with the least experience, received one-hundred and fifty dollars ($150) per hour. To set the hourly rate for each, the Court relied upon the evidence presented by each PSC member during the hearing as well as other indicators, such as the Court's own observations and/or interactions with the members throughout the case.

■ Application of the same formula to determine the hourly rate for the IPIC members who were not later appointed to the PSC [56] and PSC members' staff who participated in this litigation proved impossible. The IPIC members were primarily appointed to conduct its investigation outside the view of the Court while the large number of PSC members' legal staff had numerous and varying roles but little direct contact with the Court; i.e., some researched and wrote motions, others attended and/or participated in the trial, while others worked solely behind the scenes. Overall, the Court finds that although helpful, these attorneys are not as deserving as the individual Committee members. Consequently, the Court is unable to fairly assess each IPIC member's, partner's and associate's hourly rate individually using the above rationale. Therefore, in order to avoid arbitrary assignments of hourly rates for the eleven (11) partners and seventy-five (75) associates who participated in the litigation and the two (2) IPIC members not appointed to the PSC, it is appropriate and sufficient to assign a uniform hourly rate of one hundred and fifty dollars ($150) for partners, one hundred dollars ($100) for

associates,[57] and one hundred and fifty dollars ($150) for the IPIC members.[58]

### c. Multiplier

■ Once the lodestar has been established for each category, the Court must consider the applicability of a multiplier. When viewed in its totality, the issues germane to this case and the low risk of recovery compared to the results achieved, indicates that a multiplier is both justified and appropriate.[59] Some of the factors considered by the Court in the application of the multiplier includes, as discussed below, the contingent nature of the fee, the exceptional or unexpected results, the delay in payment, and the quality of representation.

The contingent nature of the fee, i.e. risk of recovery, was exacerbated by four obstacles which required creative solutions and a well-planned strategy. First, this litigation involved an arson fire which is traditionally problematic in that a jury could potentially find the arsonist solely at fault thereby relieving other defendants who may have contributed to the disaster from liability.

Secondly, the hotel was only insured for one-million dollars ($1,000,000); yet, damages were initially assessed by the settlement judge at more than two-hundred million dollars ($200,000,000). This also constituted an obstacle as generally a hotel, through its insurers, is the defendant responsible for paying the greatest percentage of the award in a hotel fire case.

Third, because the hotel was owned and operated through a complex maze of limited partnerships owning and operating various other business, the prospect for recov-

---

**56.** Of the original thirteen (13) IPIC members appointed, four (4) were not subsequently appointed to the PSC. However, only two (2) billed any time for attorney's fees (Antonio Moreda–Toledo and Luis E. Colón–Ramery) and only two (2) billed for costs (Ronald Motley and Antonio Moreda–Toledo, Esq.).

**57.** The hourly rates presented during the hearings for these two groups varied greatly among firms and as between firms employees; the range was from $85 to $225 per hour.

**58.** Although Antonio Moreda–Toledo testified during the hearing, an hourly rate was not presented.

**59.** Several individual plaintiffs' attorneys have objected to the use of a multiplier based on the fact that multipliers are unknown to local practice. As previously stated, where state law does not provide statutory authority for the determination of attorney fees, federal principles become relevant and applicable.

ery was through the alter-ego theory, a traditionally difficult and complex theory to prove.

Finally, the laws of Puerto Rico do not allow recovery for punitive damages. Generally, where punitive damages are allowed this has provided added pressure and an incentive for defendants to settle before trial.

Despite these seemingly overwhelming factors, the PSC managed to generate a substantial settlement fund due to their active litigation and ongoing settlement efforts. These extraordinary results were obtained in spite of a well-funded, highly-skilled and organized defense team.[60]

Additional important factors to consider in the application of a multiplier to the lodestar is the long delay in payment to the PSC members, accompanied by the fact that inordinate demands were placed upon each member's time thereby preventing him from accepting cases or otherwise developing his practice. In addition, each member was expected to absorb the high costs of litigation. These costs included the attorney's own expenses, the salary, benefits, etc., of staff members who participated in the litigation, discovery and trial expenses and the PSC Office's salaries and expenses.

Upon appointment to the PSC each member was required to pay an initial fifty-thousand dollars ($50,000) and then an additional one-hundred and fifty-thousand dollars ($150,000)[61] each to provide funds for litigation. When funds were depleted, members were forced to extend personal credit lines with local banks to finance the

expenses. On a cost/benefit basis, this was an extremely risky undertaking.

Moreover, although eleven attorneys were appointed as PSC members, the complexity of the case required that each member's time, as well as many of his support staff, be dedicated primarily to the case. In addition, the demands were such that members were prevented from accepting other cases. This, together with the great financial strain, made it especially difficult for solo practitioners or those who maintained a small firm with limited financial resources.

Finally, the Court considered the quality of representation provided by each individual PSC member. Although, as a whole, representation was exceptional, efforts expended by some were extraordinary and deserving of additional recognition by the application of a higher multiplier. Therefore, the Court chose various multipliers to be utilized, ranging between 1.5 and 2.75.[62] However, using the same reasoning as explained above in relation to the hourly rates, the multiplier for other attorney hours which accrued during litigation will be uniform, i.e. partners will receive a multiplier of 1.5, associates will receive 1.25 and IPIC members will receive 1.5.

### d. Support Staff

■ The final factor in the equation of the attorney fee award is the reimbursement rate for paralegal and law clerk staff.[63] During the hearing and the subsequent motions, the main issue raised was whether these services should be reimbursed at cost or at the actual hourly billing rate of the law firm for that particular

---

60. The defendants were organized through the "Center of Public Resources" (CPR) which, in the early days of litigation, had initiated a Joint Defense Judgment/Settlement Sharing Agreement. In effect, this agreement restrained the signatories from settling individually. *See* Order No. 214 (docket No. 12088, filed on August 2, 1989) and Order No. 221 (docket No. 12663, filed on September 14, 1989).

61. *See* Order Nos. 2 (docket No. 95, filed on March 18, 1987) and 103 (docket No. 4355, filed on August 3, 1988).

62. In *MGM* multipliers were applied ranging from 1.00 to 2.95.

63. Several individual plaintiffs' counsel suggested, without any supporting authority, that the Court classify these hours as an expense to be deducted from the plaintiffs' awards rather than as part of the attorney fee formula. It is the understanding of the Court that the usual practice is to bill paralegal and law clerk hours as fees rather than costs. To do otherwise would result in a direct and apparent conflict of interest between attorney and client.

service.[64] The testimony provided throughout the hearing showed that the use of paralegal and/or law clerk staff where possible, rather than more skilled and higher paid associates, provides a savings to both the parties and the law firms and that reimbursement at less than actual billing rates would serve as a disincentive to use lower paid legal employees. However, the Court's subsequent review revealed that, in some instances, there existed a billing rate of five hundred percent (500%) over the hourly salary paid to the paralegal.[65]

Although the need for a law firm to generate profit is understandable, the Court finds that such profit is excessive. As an alternative, the Court structured a rate based on the average hourly salary actually paid to each group multiplied by the factor of three (3) to allow for employee benefits, bonuses, and a reasonable profit margin. Consequently, the hourly reimbursement rate for paralegals was established at thirty-seven dollars and fifty cents ($37.50) and for law clerks at twenty-eight dollars and fifty cents ($28.50).

## E. Costs

In addition to the attorney fees, those expenses accrued from the beginning of the case through January 31, 1991 will be reimbursed from the plaintiffs' awards, after the deduction of attorney fees. Although these expenses will be referred to collectively as costs, they are distinguishable into several different categories as explained below.

The IPIC[66] and PSC members incurred individual litigation expenses[67] while working on behalf of all plaintiffs. These expenses were audited every sixty (60) days by a court-appointed certified public accountant[68] according to guidelines estab-

---

**64.** The Court requested and the parties submitted motions indicating the actual salary for each paralegal and law clerk who worked on this case. Submissions were filed *under seal* by the following attorneys: Waite, Schneider, Bayless & Chesley (docket No. 16348, filed on February 26, 1991); Jiménez, Graffam & Lausell (docket No. 16351, filed on February 26, 1991); PSC/Peter Berkowitz (docket No. 16360, filed on February 27, 1991); Ortiz Toro & Ortiz Brunet (docket No. 16361, filed on February 27, 1991); Francisco M. Troncoso (docket No. 16364, filed on February 27, 1991); Cummings, Cummings & Dudenhefer's (docket No. 16368, filed on February 28, 1991); Will Kemp's Motion (docket No. 16373, filed on February 28, 1991); and Wendell H. Gauthier (docket No. 16374, filed on February 28, 1991). In addition, during the hearings, each law firm indicated their firm's billing rate for paralegals and law clerks. Leave to file documents under seal requested on docket Nos. 16347, 16350, 16359 and 16367 is hereby GRANTED.

**65.** The range of billing rates for paralegals was $30.00–$85.00 per hour while the salaries paid were $6.25–$24.50 per hour. The billing rates for law clerks were $30.00–$60.00 per hour and salaries ranged from $7.00 to $15.50 per hour.

**66.** Pursuant to Order No. 312, Teresita Picó Vidal, Esq. (docket No. 16467, filed on March 22, 1991) objected to the reimbursement of these expenses from plaintiffs' awards, suggesting that each IPIC member's expenses should be reimbursed by that particular attorney's client. However, because Ms. Picó Vidal completely failed to articulate any justification for this conclusion, this motion is DENIED.

**67.** According to Order Nos. 308 (docket No. 16249, filed *under seal* on February 12, 1991) and 310 (docket No. 16261, filed *under seal* on February 14, 1991) individual plaintiffs' counsel were to file objections to expenses along with the those to attorney fees. Although many motions contained general statements that expenses should not exceed a certain percentage of the settlement awards, only few contained objections specific enough to require the Court's attention. (*See* list of motions in footnotes 3 & 6.)

Specific objections to certain tasks, and the attendant expenses, were raised by Virginia Zequeira Brinsfield, Esq. (docket No. 16302) in a motion filed on February 15, 1991. However, the Court hereby denies the objection given that the tasks which were allegedly unnecessary to the success of this litigation were addressed to the satisfaction of this Court by various PSC members during the evidentiary hearing of February 19 and 20, 1991.

Antonio Moreda Toledo, Esq. (docket Nos. 16318 & 16392, filed on February 15, 1991 and March 1, 1991, respectively) contended that representations were initially made to clients regarding the percentage of their awards required for PSC expenses which were not being honored. Counsel is referred to the Court's response to a similar argument raised regarding the percentage of settlement funds estimated for attorney fees. (*See* Sec. II(D)(1) above.)

**68.** *See* Order No. 222 (docket No. 12671, filed *under seal* on September 15, 1989) appointing Mr. C. Terry Raben, C.P.A., of Dulin & Raben Ltd., Las Vegas, Nevada.

lished by the Court for "hard" and "soft" costs.[69] These figures were tallied and incorporated into the accountant's reports, which also contained the hours each member expended.

These expenses were approved by the Court as the reports were filed. The final report contained all the necessary modifications ordered by the Court. Thus, the figures set forth in the final report are true and accurate totals of the expenses of each PSC member, in accordance with the Court's guidelines. The PSC members are entitled to nine million, five hundred sixty-eight thousand, six hundred sixty-five dollars and seventeen cents ($9,568,665.17) in costs.[70] (*See* Schedule B).

The above figure also reflects other expenses related to this litigation which were absorbed into the costs for each PSC member, including the maintenance of a PSC Office and the salaries of the PSC liaison and other support staff.[71] (*See* Sec. I(B)(2) above for further discussion concerning this office). The expenses were initially offset by the assessments levied against the PSC members and the individual plaintiffs' attorneys. Later, the PSC members were required to extend individual lines of credits (advances) from various lending institutions to cover the expenses generated by the operation of the PSC Office.

A certified public accountant also reviewed all PSC Office related expenses and issued monthly reports for review by the members.[72] These reports were filed with the Court as exhibits during the evidentiary hearing of February 19 and 20, 1991. The total balance for the four (4) years that the PSC has been in operation is six million, nine hundred fifty-six thousand, three hundred sixty-eight dollars and twenty-seven cents ($6,956,368.27),[73] which the Court finds is an accurate reflection of allowable costs.

■ Expenses incurred by individual plaintiffs' attorneys who presented and/or prepared the damages cases are also reflected in the expenses for each PSC member.[74] Because presentation of these cases impacted on the success of the litigation, to the benefit of all plaintiffs, the Court finds that these litigation expenses should be allocated proportionately among all plaintiffs rather than paid by a single plaintiff from his/her award.[75] These costs were

---

69. "Hard" costs consists of office overhead, staff salaries, warehousing, duplication, expert fees, deposition costs, etc.; "soft" costs refer to travel, meals, transportation, lodging, etc. All members were required to submit detailed records supporting these expenditures. *See* Pretrial Order Nos. 2 (docket No. 95, filed on March 18, 1987) and 127 (Amended Case Management Order, docket No. 7100, filed on December 2, 1988) pp. 44–45.

70. This total is reached by subtracting the disallowances per PSC audit ($138,569.06) from the total PSC expenses ($9,707,234.23). (*See* Schedule C, Section I).

71. At the height of litigation, as many as ten (10) employees were on the PSC Office payroll.

72. At a Committee meeting on May 7, 1987, the PSC unanimously voted to retain the accounting services of Donald J. Kevane, C.P.A., Kevane, Peterson, Soto & Passarell, Hato Rey, Puerto Rico.

73. This includes the amount of checks written against the PSC Office Account ($6,704,307.00) plus the amounts reimbursed directly from the trust ($252,061.27) pursuant to Court Order. Although this figure is not separately listed in Schedule C, the amount is indicated on the final

accounting report for the PSC Office and reconciled with the funds paid into this account by the individual PSC members.

74. It appears that several individual plaintiffs' counsel who presented and/or prepared the damages cases submitted their expenses to the PSC Office for reimbursement while others submitted their costs by motion to the Court. (*See* motions listed in footnote 64). The expenses submitted to the PSC Office were reviewed by the court-appointed accountant and are reflected as PSC Office costs. To ensure uniformity and consistency with these established guidelines, attorneys who submitted expenses by motion to the Court shall resubmit the same to the PSC Office for incorporation into PSC Office expenses. Upon verification and certification of these costs, the PSC Office shall reimburse the individual plaintiffs' counsel for these expenses accordingly. COUNSEL ARE REMINDED THAT SUCH EXPENSES SHALL NOT BE DEDUCTED FROM THE PLAINTIFFS' AWARD EVEN THOUGH THE EXPENSES MAY NOT YET BE REIMBURSED BY THE PSC OFFICE AT THE TIME OF THIS DISTRIBUTION.

75. Pursuant to Order No. 312, Teresita Picó Vidal, Esq. (docket No. 16468, filed on March 22, 1991) objected to the expenses of the individual plaintiffs' counsel who presented and/or pre-

incorporated into the accounting reports generated for the PSC Office expenses.

Although expenses were not regularly reimbursed, there were two (2) occasions during which the Court released limited settlement funds for payment of expenses due to the financial hardships created by the economic burden of this litigation. Interim disbursements of one million and fifty thousand dollars ($1,050,000.00)[76] and seven million, one hundred and twenty-two thousand, nine hundred and thirty-eight dollars and seventy-three cents ($7,122,-938.73) were made to defray PSC member costs.[77] Accordingly, these payments will be reflected as credits to the respective accounts. (*See* Schedule B).

In addition, three other payments were made directly from the settlement funds to accounts due. First, for tax purposes, the Puerto Rico State Insurance Fund was paid a total of two hundred thousand dollars ($200,000.00).[78] Secondly, Tom H. Foulds, Esq. was paid four hundred and twenty-five thousand dollars ($425,000.00) for expert services rendered during the Phase I Trial.[79] Finally, a third payment totalling two hundred fifty-two thousand, sixty-one hundred dollars and twenty-seven cents ($252,061.27) was made to offset PSC Office expenses.[80] Although considered PSC expenses, the total of these three payments ($877,061.27) will not be reflected in the expenses shown for the PSC members, as these were payments made directly from the settlement funds. (*See* Schedule C, Section II).

There are several other outstanding expenses which shall be paid directly from the settlement fund upon further order of the Court. These particular expenses ($5,876,139.90) are also not reflected in the costs of the PSC members. They include: the reimbursement of assessments paid by the individual plaintiffs' attorney for the initial PSC Office's operating costs; the trustees' fees; and, the contingency costs allowed by the Court for future expenses. (*See* Schedule C, Section III).

When assessments were levied against the individual plaintiffs' attorneys,[81] the Court was not in a position to take into account the proportional value of each plaintiffs' award to the full amount of damages. Instead, two (2) categories were created for payment purposes; i.e. for claims alleging wrongful death, the attorney was

pared damages cases during the Phase II Trial by stating that these efforts "in no way whatsoever benefited our clients" because the results of "the tried damages cases had been unfavorable." The Court strongly disagrees. The presentation of the damages cases of the representative plaintiffs augmented the jury's understanding of the consequences of this fire, particularly in light of the complex liability theories and evidence presented.

76. *See* Court Margin Order No. 531 (docket No. 12672, filed *under seal* on September 15, 1989) disbursing the full amount for PSC members' costs.

77. Court Margin Order No. 746 (docket No. 15911, filed *under seal* on November 15, 1990) disbursing $5,510,000.00 for payment of advances (loans) and $1,612,938.73 for PSC members' costs.

78. *See* Court Margin Order No. 751 (docket No. 16014, filed *under seal* on December 6, 1990).

79. *See* Court Margin Order No. 755 (docket No. 16065, filed *under seal* on December 27, 1991).

80. These funds plus the payments made to the P.R. State Insurance Fund ($200,000.00) and

Tom Foulds, Esq. ($425,000.00) make up the remainder of the eight million dollars ($8,000,-000,000) released pursuant to Order No. 746 and to offset PSC Office expenses. *See* Court Margin Order Nos. 752, 758, which reflects a total payment of one hundred six thousand, two hundred fifteen dollars and eighteen cents ($106,-215.18) through January 31, 1991. *See also,* Court Margin Order Nos. 760, 763, 766, 769 & 772, which reflect payments of one hundred forty-five thousand, eight hundred forty-six dollars and nine cents ($145,846.09) approved subsequently.

81. *See* Pretrial Order No. 2 (docket No. 95, filed on March 18, 1987) setting the assessment. In addition, a second assessment was subsequently levied for construction of the courtroom, which was eventually used for operational costs of the Joint Document Depository. *See* Pretrial Order No. 135 (docket No. 7624, filed on January 17, 1989). The payment of this second assessment to individual plaintiffs' counsel will not be addressed at this time but will be reconciled during the final distribution. Counsel are admonished that this second assessment may not be claimed as an individual plaintiffs' attorney expense to be deducted from plaintiffs' awards disbursed in this distribution.

assessed eight hundred dollars ($800.00), for claims alleging personal injuries or derivative damages, the attorney was assessed three hundred dollars ($300.00). Therefore, rather than having the assessment reflect a pure expense to be reimbursed by the plaintiff to his/her individual counsel, the Court will add the assessment to the costs figure to be apportioned among the plaintiffs according to the size of the individual awards. Under separate order, the Court shall reimburse individual plaintiffs' attorneys for their assessment from the settlement monies set aside as costs. Accordingly, the total amount of the assessment to be reflected as a cost for this purpose is seven hundred and sixty-six thousand, seven hundred dollars ($766,700.00).[82]

The trustees' fees for the maintenance of the settlement funds, to be deducted from the income earned through June 21, 1991 totals one million, five hundred and forty-five thousand, eight hundred and sixty-four dollars and ninety cents ($1,545,864.90). This is made up of eight hundred and eighty-eight thousand, five hundred and thirty-four dollars and forty-five cents ($888,534.45) for Banco Central Corporation and six hundred and fifty-seven thousand, three hundred and thirty dollars and forty-five cents ($657,330.45) for Meridian Trust Company.[83] These fees shall be paid pursuant to future Court Order.

Finally, an amount will be set aside for the payment of contingency costs which may arise prior to the conclusion of the litigation. These costs include: accrued, but not yet audited, and prospective PSC expenses ($1,341,075.00); set asides pursuant to settlement agreement terms between the PSC and several settled defendants ($200,000.00); indemnity contingency for unidentified plaintiff claims ($1,000,000.00); reimbursement to individual plaintiffs' counsel for the second assessment ($677,500.00); and projected trustee/disbursement costs ($345,000.00). These contingency costs, totalling ($3,563,575.00) shall be held in trust until further order of the Court. Any monies remaining in this contingency fund at the completion of the case shall be paid to the plaintiffs directly in accordance with their pro-rata share. The total amount for costs is sixteen million, three hundred twenty-one thousand, eight hundred sixty-six dollars and thirty-four cents ($16,321,866.34) to be shared by all plaintiffs (*See* Schedule C). These costs represent seven point thirty-nine percent (7.39%) of the total settlement fund ($220,908,549.78) to be reimbursed at this time.

## III. CONCLUSION

It has been four and one-half years since the arson fire at the San Juan Dupont Plaza Hotel which gave rise to this complex "litigatory monster."[84] After two trial phases totalling eighteen (18) months, there remains a third phase dealing primarily with the issue of insurance coverage to be resolved. At this time, there is approximately two hundred twenty million, nine hundred eight thousand, five hundred forty-nine dollars and seventy-eight cents ($220,908,549.78) accumulated in the settlement fund as a result of the various settlement agreements and jury verdict. The Court finds that the Phase III litigation will not affect the results of the previous phases in any way and consequently sees no reason why distribution of the settlement fund to the victims and their attorneys should not go forward at this time.

Accordingly, the Court hereby ORDERS the Trustee to set aside the amounts identified herein for PSC attorney fees and costs so that the victims' awards and the fees due to their attorneys can be determined and distributed.

The PSC shall serve this document on this date via facsimile and by overnight mail upon Claudio D. Ballester, Executive Trust Officer, Banco Central Corp., P.O.

---

**82.** *See* PSC Response to Order No. 318 (docket No. 16595, filed *under seal* on April 30, 1991) exhibits A & B.

**83.** *See* PSC's Response to Order No. 330 (docket No. 16888, filed *under seal* on June 4, 1991) exhibit 3.

**84.** *See In re Recticel Foam Corporation,* 859 F.2d 1000 (1st Cir.1988).

Box 6270, General Post Office, San Juan, P.R. 00936–6270 (Fax (809) 250–3399); Michael J. Noon, Asst. Vice–President, Meridian Asset Management, 35 North Sixth Street, P.O. Box 1102, Reading, PA 19603 (Fax (215) 320–2332), by facsimile to all PSC members and by overnight mail to all counsel representing individual plaintiffs in these consolidated actions and shall file with this Court a Certificate of Service upon completion.

IT IS SO ORDERED.

SCHEDULE "A"

PLAINTIFFS' STEERING COMMITTEE/DUPONT HOTEL LITIGATION
FEE SCHEDULE

| ATTY. | MEMBER | $150. PARTNER | $100. ASSO-CIATE | M/P/A* MUL-TIPLE | M/P/A* HOURS SUB-TOTAL | SUB-TOTAL | $37.50 PARA-LEGAL | $28.50 LAW CLERK | TOTAL FEE TO BE PAID |
|---|---|---|---|---|---|---|---|---|---|
| PETER BERKOWITZ | 3,486.25 hrs. | 52.45 hrs. | 61.75 hrs. | 2 | $1,220,187.50 | $1,239,707.50 | 0 hrs. | 15.00 hrs. | $1,240,135.00 |
| | | | | 1 5 | $11,801.25 | | | | |
| (rate/hr. $175.00) | $610,093.75 | $7,867.50 | $6,175.00 | 1.25 | $7,718.75 | | $0.00 | $427.50 | |
| ALVARO CALDERON | 5,129.50 hrs. | 0 hrs. | 588 00 hrs. | 2.5 | $2,564,750.00 | $2,638,250.00 | 0 hrs. | 0 hrs. | $2,638,250.00 |
| | | | | 1.5 | $0.00 | | | | |
| (rate/hr. $200.00) | $1,025,900.00 | $0.00 | $58,800.00 | 1 25 | $73,500.00 | | $0.00 | $0 00 | |
| STANLEY CHESLEY | 3,654.25 hrs. | 0 hrs. | 9,481.25 hrs. | 2 25 | $1,644,412.50 | $2,829,568.75 | 9,405 75 hrs | 873.50 hrs. | $3,207,179.13 |
| | | | | 1.5 | $0.00 | | | | |
| (rate/hr. $200.00) | $730,850.00 | $0.00 | $948,125.00 | 1.25 | $1,185,156.25 | | $352,715.63 | $24,894.75 | |
| JOHN CUMMINGS | 4,714.00 hrs. | 379.00 hrs. | 10,339.20 hrs. | 2.15 | $2,027,020 00 | $3,404,695.00 | 8,160.00 hrs. | 763.25 hrs | $3,732,447 63 |
| | | | | 1.5 | $85,275.00 | | | | |
| (rate/hr. $200.00) | $942,800.00 | $56,850 00 | $1,033,920.00 | 1.25 | $1,292,400.00 | | $306,000.00 | $21,752.63 | |
| WENDELL GAUTNIER | 8,335.25 hrs. | 430.50 hrs. | 13,603.65 hrs. | 2.6 | $4,334,330.00 | $6,131,648.75 | 15,487.50 hrs. | 1,554.00 hrs. | $6,756,719.00 |
| | | | | 1.5 | $96,862.50 | | | | |
| (rate/hr. $200.00) | $1,667,050.00 | $64,575.00 | $1,360,365 00 | 1 25 | $1,700,456.25 | | $580,781.25 | $44,289.00 | |
| DAVID C. INDIANAO | 7,900.80 hrs. | 437.25 hrs. | 159.45 hrs. | 2.15 | $2,548,008.00 | $2,666,320.50 | 85.50 hrs. | 172.20 hrs. | $2,674,434.45 |
| | | | | 1.5 | $98,381.25 | | | | |
| (rate/hr. $150 00) | $1,185,120.00 | $65,587.50 | $15,945.00 | 1.25 | $19,931.25 | | $3,206.25 | $4,907.70 | |
| WILL KEMP | 10,607.40 hrs. | 8 hrs. | 7,053.40 hrs. | 2.75 | $5,834,070.00 | $6,717,545.00 | 11,698.10 hrs. | 1,306.20 hrs. | $7,193,450.45 |
| | | | | 1.5 | $1,800.00 | | | | |
| (rate/hr. $200.00) | $2,121,480.00 | $1,200.00 | $705,340 00 | 1.25 | $881,675.00 | | $438,678.75 | $37,226.70 | |
| HARVEY MACHMAN | 6,554.84 hrs. | 195.00 hrs. | 228.50 hrs. | 2.5 | $3,277,420.00 | $3,349,857.50 | 0 hrs. | 0 hrs. | $3,349,857.50 |
| | | | | 1.5 | $43,875.00 | | | | |
| (rate/hr. $200.00) | $1,310,968.00 | $29,250 00 | $22,850 00 | 1 25 | $28,562.50 | | 0.00 | 0.00 | |
| PAGE SUB-TOTALS | $9,594,261.75 | $225,330.00 | $4,151,420.00 | — | $28,977,593.00 | $29,977,593.00 | $1,681,381 88 | $133,498.28 | $30,792,473.16 |
| JORGE ORTIZ BRUMET | 5,280.50 hrs. | 0 hrs. | 3,843.40 hrs. | 1.75 | $1,617,153.13 | $2,097,578 13 | 727.70 hrs. | 1,772 00 hrs. | $2,175,368.88 |
| | | | | 1 5 | $0.00 | | | | |
| (rate/hr. $175.00) | $924,027.50 | $0 00 | $384,340.00 | 1.25 | $480,425.00 | | $27,288.75 | $50,502.00 | |
| JORGE SURO BALLESTER | 2,344.50 hrs | 0 hrs. | 0 hrs. | 1.5 | $527,512.50 | $527,512.50 | 0 hrs. | 0 hrs. | $527.512.50 |
| | | | | 1.5 | $0.00 | | | | |
| (rate/hr. $150.00) | $351,675.00 | $0.00 | $0.00 | 1.25 | $0.00 | | $0 00 | $0.00 | |
| FRANCISCO TROMCOSO | 6,914.75 hrs. | 0 hrs. | 1,800.00 hrs | 1.75 | $2,117,642.19 | $2,352,642 19 | 0 hrs. | 64.50 hrs. | $2,354,480.44 |
| | | | | 1.5 | $0.00 | | | | |
| (rate/hr. $175.00) | $1,210,081 25 | $0 00 | $100,000.00 | 1.25 | $235,000.00 | | $0.00 | $1,838.25 | |
| IPIC | | | | | | | | | |
| ANTONIO MOREDA | 90.25 hrs. | 0 hrs | 0 hrs. | 1.5 | $20,306.25 | $20,306.25 | 0 hrs. | 0 hrs. | $20,306.25 |
| | | | | | $0.00 | | | | |
| (rate/hr. $150.00) | $13,537.50 | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 | |

| ATTY. | MEMBER | $150. PARTNER | $100. ASSOCIATE | M/P/A* MUL-TIPLE | M/P/A* HOURS SUB-TOTAL | SUB-TOTAL | $37.50 PARA-LEGAL | $28.50 LAW CLERK | TOTAL FEE TO BE PAID |
|---|---|---|---|---|---|---|---|---|---|
| LUIS E. COLON RAMERY | 63.00 hrs. | 0 hrs. | 0 hrs. | 1.5 | $14,175.00 | $14,175.00 | 0 hrs. | 0 hrs. | $14,175 00 |
| | | | | | $0.00 | | | | |
| (rate/hr. $150 00) | $9,450.00 | $0.00 | $0.00 | | $0.00 | | $0.00 | $0.00 | |
| PAGE SUB-TOTALS | $2,508,831.25 | $0.00 | $572,340.00 | — | $5,012,214.07 | $5,012,214.07 | $27,288.75 | $52,340.25 | $5,091,843.07 |
| TOTALS | $12,103,093.00 | $225,330.00 | $4,723,760.00 | — | $33,989,807.07 | $33,989,807.07 | $1,708,670.63 | $185,838.53 | $35,884,316.23 |

\* Member/Partner/Associate

SCHEDULE "B" — PLAINTIFFS' STEERING COMMITTEE MEMBERS' COSTS THROUGH JANUARY 31, 1991

| MEMBER | HARD COSTS | SOFT COSTS | ADVANCES | TOTAL COSTS | LESS REIMBURSE-MENTS | LESS PAYOFF OF NOTES FOR ADVANCES | LESS NET DISALLOWANCES PER PSC AUDIT | NET COSTS DUE |
|---|---|---|---|---|---|---|---|---|
| PETER BERKOWITZ | $119,364.54 | $9,290.71 | $535,000.00 | $663,655.25 | $89,627.43 | $500,000.00 | $17,790.81 | $56,237.01 |
| ALVARO CALDERON | 71,063.36 | 18,004 94 | 535,000.00 | 624,068.30 | 49,458.96 | 500,000.00 | 7,728.08 | 66,881.26 |
| JOHN CUMMINGS | 247,581.42 | 189,279.73 | 510,000.00 | 946,861 15 | 247,032.42 | 510,000.00 | 54,895.63 | 134,933.10 |
| WENDEL W. GAUTHIER | 522,643.09 | 587,046 35 | 535,000.00 | 1,644,689.44 | 778,489.94 | 500,000 00 | 299.00 | 365,900.50 |
| DAVID C. INDIANO | 85,637.53 | 31,540.99 | 535,000 00 | 652,178.52 | 74,330 86 | 500,000.00 | 3,673.46 | 74,174.20 |
| WILL KEMP | 208,211.08 | 352,391 15 | 535,000 00 | 1,095,602.23 | 351,558.99 | 500,000.00 | 7,742.38 | 236,300.86 |
| HARVEY B. MACHMAN | 281,801.53 | 51,355.40 | 535,000 00 | 868,156.93 | 267,454.40 | 500,000.00 | 8,610.85 | 92,091.68 |
| Page Sub-Totals | $1,536,302.55 | $1,238,909.27 | $3,720,000.00 | $6,495,211.82 | $1,857,953 00 | $3,510,000.00 | $100,740.21 | $1,026,518.61 |
| FRANCISCO N. TRONCOSO | 83,040.91 | 28,239.38 | 535,000.00 | 646,280 29 | 67,338.53 | 500,000.00 | 636.25 | 78,305.51 |
| JORGE ORTIZ BRUNET | 80,424.48 | 21,449.76 | 535,000.00 | 636,874 24 | 64,946.22 | 500,000.00 | 8,496.27 | 63,431 75 |
| JORGE H. SURO BALLESTER | 72,749.00 | 2,743.62 | 535,000 00 | 610,492.62 | 37,466.12 | 500,000.00 | 5,244.29 | 67,782 21 |
| STANLEY M. CHESLEY | 400,972.38 | 344,583.97 | 535,000.00 | 1,280,556.35 | 599,410.44 | 500,000.00 | 21,457.55 | 159,688 36 |
| IPIC | | | | | | | | |
| RONALD MOTLEY | 27,085.53 | 9,972.46 | — | 37,057.99 | 35,063.50 | — | 1,994.49 | 0 00 |
| ANTONIO MOREDA | 760.92 | — | — | 760.92 | 760.92 | — | — | 0.00 |
| Page Sub-Totals | $665,033.22 | $406,989.19 | $2,140,000.00 | $3,212,022.41 | $804,985 73 | $2,000,000.00 | $37,828.85 | $369,207.83 |
| TOTALS | $2,201,335.77 | $1,645,898.46 | $5,860,000.00 | $9,707,234.23 | $2,662,938.73 | $5,510,000.00 | $138,569.06 | $1,395,726.44 |

## SCHEDULE "C"

I. PSC Members' Costs:

| | |
|---|---|
| Hard Costs– | $2,201,335.77 |
| Soft Costs– | 1,645,898.46 |
| Advances *– | 5,860,000.00 |
| Subtotal | $9,707,234.23 |
| Less Disallowance | 138,569.06 |
| TOTAL | $ 9,568,665.17 |

\* Credit lines extended for PSC Office expenses.

II. PSC Costs Paid Directly From Settlement Trust:

| | | |
|---|---|---|
| P.R. State Insurance Fund | $ 200,000.00 | |
| Tom Foulds, Esq. | 425,000.00 | |
| PSC Office Expenses | 252.061.27 | |
| TOTAL | | $ 877,061.27 |

III. PSC Costs to be Withheld/Reimbursed From Settlement Trust:

| | | |
|---|---|---|
| Repayment of Attorney Assessments | $ 766,700.00 | |
| Trustee fees | 1,545,864.90 | |
| Contingency Costs | 3,563,575.00 | |
| TOTAL | | $ 5,876,139.90 |
| GRAND TOTAL: | | $16,321,866.34 |